NATIONAL LABOR RELATIONS BOARD *v.*
AMERICAN NATIONAL INSURANCE CO.

No. 126.   Argued March 4, 1952.—Decided May 26, 1952.

396

*Mozart G. Ratner* argued the cause for petitioner. With him on the brief were *Solicitor General Perlman, George J. Bott, David P. Findling* and *Marcel Mallet-Prevost.*

*Louis J. Dibrell* argued the cause for respondent. With him on the brief were *M. L. Cook* and *Charles G. Dibrell, Jr.*

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

This case arises out of a complaint that respondent refused to bargain collectively with the representatives of its employees as required under the National Labor Relations Act, as amended.[1]

The Office Employees International Union, A. F. of L., Local No. 27, certified by the National Labor Relations Board as the exclusive bargaining representative of respondent's office employees, requested a meeting with respondent for the purpose of negotiating an agreement governing employment relations. At the first meetings,

[1] 49 Stat. 449 (1935), 29 U. S. C. § 151 *et seq.*, as amended, 61 Stat. 136 (1947), 29 U. S. C. (Supp. IV) § 151 *et seq.*

beginning on November 30, 1948, the Union submitted a proposed contract covering wages, hours, promotions, vacations and other provisions commonly found in collective bargaining agreements, including a clause establishing a procedure for settling grievances arising under the contract by successive appeals to management with ultimate resort to an arbitrator.

On January 10, 1949, following a recess for study of the Union's contract proposals, respondent objected to the provisions calling for unlimited arbitration. To meet this objection, respondent proposed a so-called management functions clause listing matters such as promotions, discipline and work scheduling as the responsibility of management and excluding such matters from arbitration.[2] The Union's representative took the position "as soon as [he] heard [the proposed clause]" that the Union would not agree to such a clause so long as it covered matters subject to the duty to bargain collectively under the Labor Act.

Several further bargaining sessions were held without reaching agreement on the Union's proposal or respondent's counterproposal to unlimited arbitration. As a result, the management functions clause was "by-passed" for bargaining on other terms of the Union's contract proposal. On January 17, 1949, respondent stated in writing its agreement with some of the terms proposed by the Union and, where there was disagreement, respondent offered counterproposals, including a clause entitled "Functions and Prerogatives of Management" along the

---

[2] As drafted during the bargaining session, the proposed clause read:

"The right to select, hire, to promote, demote, discharge, discipline for cause, to maintain discipline and efficiency of employees, and to determine schedules of work is the sole prerogative of the Company and the Company's decision with respect to such matters shall never be the subject of arbitration." (R. I, p. 97.)

lines suggested at the meeting of January 10th. The Union objected to the portion of the clause providing:

"The right to select and hire, to promote to a better position, to discharge, demote or discipline for cause, and to maintain discipline and efficiency of employees and to determine the schedules of work is recognized by both union and company as the proper responsibility and prerogative of management to be held and exercised by the company, and while it is agreed that an employee feeling himself to have been aggrieved by any decision of the company in respect to such matters, or the union in his behalf, shall have the right to have such decision reviewed by top management officials of the company under the grievance machinery hereinafter set forth, it is further agreed that the final decision of the company made by such top management officials shall not be further reviewable by arbitration."

At this stage of the negotiations, the National Labor Relations Board filed a complaint against respondent based on the Union's charge that respondent had refused to bargain as required by the Labor Act and was thereby guilty of interfering with the rights of its employees guaranteed by Section 7 of the Act and of unfair labor practices under Sections 8 (a)(1) and 8 (a)(5) of the Act.[3]

---

[3] 61 Stat. 136, 140–143 (1947):

"SEC. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, . . . .

"SEC. 8. (a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

.         .         .         .         .

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9 (a).

.         .         .         .         .

"(d) For the purposes of this section, to bargain collectively is the

While the proceeding was pending, negotiations between the Union and respondent continued with the management functions clause remaining an obstacle to agreement. During the negotiations, respondent established new night shifts and introduced a new system of lunch hours without consulting the Union.

On May 19, 1949, a Union representative offered a second contract proposal which included a management functions clause containing much of the language found in respondent's second counterproposal, quoted above, with the vital difference that questions arising under the Union's proposed clause would be subject to arbitration as in the case of other grievances. Finally, on January 13, 1950, after the Trial Examiner had issued his report but before decision by the Board, an agreement between the Union and respondent was signed.[4] The agreement contained a management functions clause that rendered nonarbitrable matters of discipline, work schedules and other matters covered by the clause. The subject of pro-

---

performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: . . . .

.     .     .     .

"Sec. 9. (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: . . . ."

[4] Respondent's suggestion that negotiation of a contract rendered the case moot has been properly rejected below. See *Labor Board* v. *Mexia Textile Mills*, 339 U. S. 563 (1950); *Labor Board* v. *Pool Mfg. Co.*, 339 U. S. 577 (1950).

motions and demotions was deleted from the clause and made the subject of a special clause establishing a union-management committee to pass upon promotion matters.

While these negotiations were in progress, the Board's Trial Examiner conducted hearings on the Union's complaint. The Examiner held that respondent had a right to bargain for inclusion of a management functions clause in a contract. However, upon review of the entire negotiations, including respondent's unilateral action in changing working conditions during the bargaining, the Examiner found that from and after November 30, 1948, respondent had refused to bargain in a good faith effort to reach agreement. The Examiner recommended that respondent be ordered in general terms to bargain collectively with the Union.

The Board agreed with the Trial Examiner that respondent had not bargained in a good faith effort to reach an agreement with the Union. But the Board rejected the Examiner's views on an employer's right to bargain for a management functions clause and held that respondent's action in bargaining for inclusion of any such clause "constituted, quite [apart from] Respondent's demonstrated bad faith, per se violations of Section 8 (a)(5) and (1)." Accordingly, the Board not only ordered respondent in general terms to bargain collectively with the Union (par. 2 (a)), but also included in its order a paragraph designed to prohibit bargaining for any management functions clause covering a condition of employment. (Par. 1 (a)).[5] 89 N. L. R. B. 185.

---

[5] The Board ordered that respondent:

"1. Cease and desist from:

"(a) Refusing to bargain collectively with Office Employees International Union, A. F. L., Local No. 27, as the exclusive representative of all of its employees at its Galveston, Texas, office, excluding guards, secretaries to department heads and executives, agents, building and maintenance employees, professional employees, department

On respondent's petition for review and the Board's cross-petition for enforcement, the Court of Appeals for the Fifth Circuit agreed with the Trial Examiner's view that the Act does not preclude an employer from bargaining for inclusion of any management functions clause in a labor agreement. The Court of Appeals further found that the evidence does not support the view that respondent failed to bargain collectively in good faith by reason of its bargaining for a management functions clause. As a result, enforcement of the portion of the Board's order directed to the management functions clause (par. 1 (a)) was denied. Other portions of the Board's order (pars. 1 (b) and 2 (a)) were enforced because respondent's unilateral action in changing working conditions during bargaining does support a finding that respondent had not bargained collectively in good faith as required by the Act. 187 F. 2d 307. We granted certiorari on petition of the Board for review of the denial of enforcement as to paragraph 1 (a) of the Board's order. 342 U. S. 809.

*First.* The National Labor Relations Act is designed to promote industrial peace by encouraging the making of voluntary agreements governing relations between unions

---

heads, and all other supervisors as defined in the Act, by insisting as a condition of agreement, that the said Union agree to a provision whereby the Respondent reserves to itself the right to take unilateral action with respect to rates of pay, wages, hours of employment, and other terms and conditions of employment;

[Paragraph (b) proscribes other conduct not pertinent to the issues before this Court.]

"2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

"(a) Upon request, bargain collectively with Office Employees International Union, A. F. L., Local No. 27, as the exclusive representative of all its employees in the appropriate unit described above with respect to rates of pay, wages, hours of employment, and other conditions of employment; . . . ."

and employers.[6] The Act does not compel any agreement whatsoever between employees and employers.[7] Nor does the Act regulate the substantive terms governing wages, hours and working conditions which are incorporated in an agreement.[8] The theory of the Act is that the making of voluntary labor agreements is encouraged by protecting employees' rights to organize for collective bargaining and by imposing on labor and management the mutual obligation to bargain collectively.

Enforcement of the obligation to bargain collectively is crucial to the statutory scheme. And, as has long been recognized, performance of the duty to bargain requires more than a willingness to enter upon a sterile discussion of union-management differences. Before the enactment of the National Labor Relations Act, it was held that the duty of an employer to bargain collectively required the employer "to negotiate in good faith with his employees' representatives; to match their proposals, if unacceptable, with counter-proposals; and to make every reasonable effort to reach an agreement." [9] The duty to bargain

---

[6] 61 Stat. 136 ("Findings and Policies"); *Consolidated Edison Co.* v. *Labor Board,* 305 U. S. 197, 236 (1938).

[7] *Labor Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 45 (1937).

[8] *Terminal Assn.* v. *Trainmen,* 318 U. S. 1, 6 (1943):

"The Railway Labor Act, like the National Labor Relations Act, does not undertake governmental regulation of wages, hours, or working conditions. Instead it seeks to provide a means by which agreement may be reached with respect to them. The national interest expressed by those Acts is not primarily in the working conditions as such. So far as the Act itself is concerned these conditions may be as bad as the employees will tolerate or be made as good as they can bargain for. The Act does not fix and does not authorize anyone to fix generally applicable standards for working conditions. . . ."

[9] *Houde Engineering Corp.,* 1 N. L. R. B. (old) 35 (1934), decided by the National Labor Relations Board organized under 48 Stat. 1183 (1934).

collectively, implicit in the Wagner Act as introduced
in Congress, was made express by the insertion of the
fifth employer unfair labor practice accompanied by an
explanation of the purpose and meaning of the phrase
"bargain collectively in a good faith effort to reach an
agreement." [10] This understanding of the duty to bar-
gain collectively has been accepted and applied through-
out the administration of the Wagner Act by the National
Labor Relations Board and the Courts of Appeal.[11]

---

[10] Before the addition of Section 8 (5), now Section 8 (a) (5), to the
bill, Senator Wagner described the bill as imposing the duty to
bargain in good faith, citing the *Houde Engineering* case, note 9,
*supra*. Hearings before the Senate Committee on Education and
Labor on S. 1958, 74th Cong., 1st Sess. 43 (1935). Section 8 (5)
was inserted at the suggestion of the Chairman of the Board that
decided *Houde*. *Id*., at 79, 136–137. The insertion of Section 8 (5)
was described by the Senate Committee as follows:

"The committee wishes to dispel any possible false impression that
this bill is designed to compel the making of agreements or to permit
governmental supervision of their terms. It must be stressed that
the duty to bargain collectively does not carry with it the duty to
reach an agreement, because the essence of collective bargaining is
that either party shall be free to decide whether proposals made to
it are satisfactory.

"But, after deliberation, the committee has concluded that this
fifth unfair labor practice should be inserted in the bill. It seems clear
that a guarantee of the right of employees to bargain collectively
through representatives of their own choosing is a mere delusion if
it is not accompanied by the correlative duty on the part of the
other party to recognize such representatives as they have been
designated (whether as individuals or labor organizations) and to
negotiate with them in a bona fide effort to arrive at a collective
bargaining agreement. . . ." S. Rep. No. 573, 74th Cong., 1st Sess.
12 (1935).

See *H. J. Heinz Co.* v. *Labor Board*, 311 U. S. 514 (1941).

[11] The Board applied the good faith test of bargaining from the
outset. 1 N. L. R. B. Ann. Rep. 85–87 (1936). Cases in the Courts
of Appeal approving and applying the good faith test of bargaining
are collected in 29 U. S. C. A. § 158, note 265.

In 1947, the fear was expressed in Congress that the Board "has gone very far, in the guise of determining whether or not employers had bargained in good faith, in setting itself up as the judge of what concessions an employer must make and of the proposals and counter-proposals that he may or may not make." [12]   Accordingly, the Hartley Bill, passed by the House, eliminated the good faith test and expressly provided that the duty to bargain collectively did not require submission of counterpro-posals.[13]   As amended in the Senate and passed as the Taft-Hartley Act, the good faith test of bargaining was retained and written into Section 8 (d) of the National Labor Relations Act.   That Section contains the express provision that the obligation to bargain collectively does not compel either party to agree to a proposal or require the making of a concession.[14]

Thus it is now apparent from the statute itself that the Act does not encourage a party to engage in fruitless marathon discussions at the expense of frank statement and support of his position.   And it is equally clear that the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the sub-stantive terms of collective bargaining agreements.

*Second.* The Board offers in support of the portion of its order before this Court a theory quite apart from the

[12] H. R. Rep. No. 245, 80th Cong., 1st Sess. 19 (1947).

[13] H. R. 3020, 80th Cong., 1st Sess., § 2 (11) (1947).

[14] Note 3, *supra.* The term "concession" was used in place of "counterproposal" at the suggestion of the Chairman of the Board that the statutory definition of collective bargaining should conform to the meaning of good faith bargaining as understood at the passage of the Wagner Act.  S. Rep. No. 105, 80th Cong., 1st Sess. 24 (1947) ; Hearings before House Committee on Education and Labor on Amend-ment to the National Labor Relations Act, 80th Cong., 1st Sess. 3174–3175 (1947).  See H. R. Rep. No. 510, 80th Cong., 1st Sess. 34 (1947).

test of good faith bargaining prescribed in Section 8 (d) of the Act, a theory that respondent's bargaining for a management functions clause as a counterproposal to the Union's demand for unlimited arbitration was, *"per se,"* a violation of the Act.

Counsel for the Board do not contend that a management functions clause covering some conditions of employment is an illegal contract term.[15]  As a matter of fact, a review of typical contract clauses collected for convenience in drafting labor agreements shows that management functions clauses similar in essential detail to the clause proposed by respondent have been included in contracts negotiated by national unions with many employers.[16]  The National War Labor Board, empow-

---

[15] Thus we put aside such cases as *Labor Board* v. *National Maritime Union,* 175 F. 2d 686 (C. A. 2d Cir. 1949) (bargaining for discriminatory hiring hall clause), where a party bargained for a clause violative of an express provision of the Act.

[16] H. R. Doc. No. 125, 81st Cong., 1st Sess. 3–10 (1949) (U. S. Dept. of Labor Bull. No. 908–12); Collective Bargaining Contracts (B. N. A. 1941), 363–368; Classified Provisions of Thirty-Seven Collective Bargaining Agreements for Wage Earners in the Iron and Steel Industry (American Iron & Steel Inst. 1948), 68–73; Tested Clauses for Union Contracts (Labor Relations Inst. 1945), 11–16; Welty, Labor Contract Clauses (1945), 76–82; Hoebreckx, Management Handbook for Collective Bargaining (1947), 177–182; Smith, Labor Law Cases and Materials (1950), 1008–1011; Industrial Relations Research Service Study No. 1, Management's Prerogatives (1945), App.; Pace, Management Prerogatives Defined in Union Contracts (Calif. Inst. Tech. 1945); Teller, Management Functions under Collective Bargaining (1947), 427–437 (23 out of 53 collective bargaining agreements examined by the author contained management functions clauses).

Writers advocating inclusion of detailed management functions clauses in collective bargaining agreements urge the desirability of defining the respective functions of management and labor in matters such as work scheduling consistent with the needs of the particular industry.  See Cox and Dunlop, Regulation of Collective Bargaining

ered during the last war "[t]o decide the dispute, and provide by order the wages and hours and all other terms and conditions (customarily included in collective-bargaining agreements),"[17] ordered management functions clauses included in a number of agreements.[18] Several such clauses ordered by the War Labor Board provided for arbitration in case of union dissatisfaction with the exercise of management functions, while others, as in the clause proposed by respondent in this case, provided that management decisions would be final.[19] Without intimating any opinion as to the form of management func-

---

by the National Labor Relations Board, 63 Harv. L. Rev. 389 (1950); Hill and Hook, Management at the Bargaining Table (1945), 56–138; Teller, Management Functions under Collective Bargaining (1947), 114–116. Separate views on "Management's Right to Manage" were presented by the Labor and Management members of The President's National Labor-Management Conference, November 5–30, 1945, U. S. Dept. of Labor Bull. No. 77 (1946), 56–62.

[17] 57 Stat. 163, 166 (1943).

[18] *United Aircraft Corp.*, 18 War Lab. Rep. 9 (1944); *Mead Corp.*, 8 War Lab. Rep. 471 (1943); *Hospital Supply Co.*, 7 War Lab. Rep. 526 (1943). See also *McQuay-Norris Mfg. Co.*, 28 War Lab. Rep. 211 (1945); Teller, Management Functions under Collective Bargaining (1947), 29–49.

Disputes as to the content of management functions clauses have also been considered by the present Wage Stabilization Board, *Basic Steel Industry*, 18 Lab. Arb. Rep. 112 (1952) (recommendation that proposed changes in clause be rejected), and by a Presidential Emergency Board, *Northwest Airlines, Inc.*, 5 Lab. Arb. Rep. 71 (1946) (recommendation that clause be incorporated in agreement).

[19] Compare *East Alton Mfg. Co.*, 5 War Lab. Rep. 47 (1942) (arbitration provision ordered), with *Atlas Powder Co.*, 5 War Lab. Rep. 371 (1942) (arbitration provision denied).

Union objections to a management functions clause as covering matters subject to collective bargaining did not deter the War Labor Board from ordering such a clause where deemed appropriate in a particular case. *Curtiss-Wright Corp.*, 25 War Lab. Rep. 83, 114–115 (1945).

tions clause proposed by respondent in this case or the desirability of including any such clause in a labor agreement, it is manifest that bargaining for management functions clauses is common collective bargaining practice.

If the Board is correct, an employer violates the Act by bargaining for a management functions clause touching any condition of employment without regard to the traditions of bargaining in the particular industry or such other evidence of good faith as the fact in this case that respondent's clause was offered as a counterproposal to the Union's demand for unlimited arbitration. The Board's argument is a technical one for it is conceded that respondent would not be guilty of an unfair labor practice if, instead of proposing a clause that removed some matters from arbitration, it simply refused in good faith to agree to the Union proposal for unlimited arbitration. The argument starts with a finding, not challenged by the court below or by respondent,[20] that at least some of the matters covered by the management functions clause proposed by respondent are "conditions of employment" which are appropriate subjects of collective bargaining under Sections 8 (a)(5), 8 (d) and 9 (a) of the Act.[21] The Board considers that employer bargaining for a clause under which management retains initial responsibility for work scheduling, a "condition of employment," for the duration of the contract is an unfair labor practice because it is "in derogation of" employees' statu-

---

[20] This is not the case of an employer refusing to bargain over an issue on the erroneous theory that, as a matter of law, such an issue did not involve a "condition of employment" within the meaning of the Act. Compare *Inland Steel Co.* v. *Labor Board,* 170 F. 2d 247 (C. A. 7th Cir. 1948) (pensions); *Labor Board* v. *J. H. Allison & Co.,* 165 F. 2d 766 (C. A. 6th Cir. 1948) (merit wage increases).

[21] Note 3, *supra.* See *Bus Employees* v. *Wisconsin Board,* 340 U. S. 383, 399 (1951).

tory rights to bargain collectively as to conditions of employment.[22]

Conceding that there is nothing unlawful in including a management functions clause in a labor agreement, the Board would permit an employer to "propose" such a clause. But the Board would forbid bargaining for any such clause when the Union declines to accept the proposal, even where the clause is offered as a counterproposal to a Union demand for unlimited arbitration. Ignoring the nature of the Union's demand in this case, the Board takes the position that employers subject to the Act must agree to include in any labor agreement provisions establishing fixed standards for work schedules or any other condition of employment. An employer would be permitted to bargain as to the content of the standard so long as he agrees to freeze a standard into a contract. Bargaining for more flexible treatment of such matters would be denied employers even though the result may be contrary to common collective bargaining practice in the industry. The Board was not empowered so to disrupt collective bargaining practices. On the contrary, the term "bargain collectively" as used in the Act "has been considered to absorb and give statutory approval to the philosophy of bargaining as worked out in the labor movement in the United States." *Telegraphers* v. *Railway Express Agency,* 321 U. S. 342, 346 (1944).

Congress provided expressly that the Board should not pass upon the desirability of the substantive terms of

---

[22] The Board's argument would seem to prevent an employer from bargaining for a "no-strike" clause, commonly found in labor agreements, requiring a union to forego for the duration of the contract the right to strike expressly granted by Section 7 of the Act. However, the Board has permitted an employer to bargain in good faith for such a clause. *Shell Oil Co.,* 77 N. L. R. B. 1306 (1948). This result is explained by referring to the "salutary objective" of such a clause. *Bethlehem Steel Co.,* 89 N. L. R. B. 341, 345 (1950).

labor agreements. Whether a contract should contain a clause fixing standards for such matters as work scheduling or should provide for more flexible treatment of such matters is an issue for determination across the bargaining table, not by the Board. If the latter approach is agreed upon, the extent of union and management participation in the administration of such matters is itself a condition of employment to be settled by bargaining.

Accordingly, we reject the Board's holding that bargaining for the management functions clause proposed by respondent was, *per se,* an unfair labor practice. Any fears the Board may entertain that use of management functions clauses will lead to evasion of an employer's duty to bargain collectively as to "rates of pay, wages, hours and conditions of employment" do not justify condemning all bargaining for management functions clauses covering any "condition of employment" as *per se* violations of the Act. The duty to bargain collectively is to be enforced by application of the good faith bargaining standards of Section 8 (d) to the facts of each case rather than by prohibiting all employers in every industry from bargaining for management functions clauses altogether.

*Third.* The court below correctly applied the statutory standard of good faith bargaining to the facts of this case. It held that the evidence, viewed as a whole, does not show that respondent refused to bargain in good faith by reason of its bargaining for a management functions clause as a counterproposal to the Union's demand for unlimited arbitration. Respondent's unilateral action in changing working conditions during bargaining, now admitted to be a departure from good faith bargaining, is the subject of an enforcement order issued by the court below and not challenged in this Court.

Last term we made it plain that Congress charged the Courts of Appeals, not this Court, with the normal and primary responsibility for reviewing the conclusions of

the Board. We stated that this Court "is not the place to review a conflict of evidence nor to reverse a Court of Appeals because were we in its place we would find the record tilting one way rather than the other, though fair-minded judges could find it tilting either way." *Labor Board* v. *Pittsburgh S. S. Co.,* 340 U. S. 498, 503 (1951). We repeat and reaffirm this rule, noting its special applicability to cases where, as here, a statutory standard such as "good faith" can have meaning only in its application to the particular facts of a particular case.

Accepting as we do the finding of the court below that respondent bargained in good faith for the management functions clause proposed by it, we hold that respondent was not in that respect guilty of refusing to bargain collectively as required by the National Labor Relations Act. Accordingly, enforcement of paragraph 1 (a) of the Board's order was properly denied.[23]

*Affirmed.*

MR. JUSTICE MINTON, with whom MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS join, dissenting.

I do not see how this case is solved by telling the National Labor Relations Board that since *some* "management functions" clauses are valid (which the Board freely admits), respondent was not guilty of an unfair labor practice *in this case.* The record is replete with evidence that respondent insisted on a clause which would classify the control over certain conditions of employment as a management prerogative, and that the insistence took the form of a refusal to reach a settlement unless the Union accepted the clause.[1] The Court of

---

[23] See *Labor Board* v. *Crompton Mills,* 337 U. S. 217, 226–227 (1949).

[1] A member of respondent's negotiating committee stated that the committee "had given considerable thought to the character of prerogative that, in our opinion, the Company was entitled to main-

Appeals agreed that respondent was "steadfast" in this demand. Therefore, *this case* is one where the employer came into the bargaining room with a demand that certain topics upon which it had a duty to bargain were to be removed from the agenda—that was the price the Union had to pay to gain a contract. There is all the difference between the hypothetical "management functions" clauses envisioned by the majority and this "management functions" clause as there is between waiver and coercion. No one suggests that an employer is guilty of an unfair labor practice when it proposes that it be given unilateral control over certain working conditions and the union accepts the proposal in return for various other benefits. But where, as here, the employer tells the union that the only way to obtain a contract as to wages is to agree not to bargain about certain other work-

tain for its management, as well as considerable thought to the character of safeguard which would make the retention of such prerogatives . . . of value and worth to the Company, and invulnerable to attack. . . . [W]e orally stated to the Union that that was going to be the position of the Company . . . ." (R. II, p. 32.)

A Union negotiator testified as follows:

"Q. Now, as I understand your testimony, you have said that Company said you would have to agree . . . .

"A. It was the condition of a contract.

"Q. Now, how often, if it was more than once, did the Company state that or something similar to that . . . did they only say it once or did they state it more than once?

"A. I can't testify as to the number of times. I will say they said it several times.

.        .        .        .        .

"A. To get a contract, an agreement must be reached and must be made by the Union to include Article II–A as the Company's prerogative clause." (R. III, pp. 60–61.)

The same Company negotiator told the Union that the clause in question was the "meat of the contract" and that if the Union accepted it a contract could be obtained in "short order." (R. III, p. 60.)

ing conditions, the employer has refused to bargain about those other working conditions. There is more than a semantic difference between a proposal that the union waive certain rights and a demand that the union give up those rights as a condition precedent to enjoying other rights.[2]

I need not and do not take issue with the Court of Appeals' conclusion that there was no absence of good faith. Where there is a refusal to bargain, the Act does not require an inquiry as to whether that refusal was in good faith or bad faith.[3] The duty to bargain about certain subjects is made absolute by the Act.[4] The majority seems to suggest that an employer could be found guilty of bad faith if it used a "management functions" clause to close off bargaining about all topics of discussion. Whether the employer closes off all bargaining or, as in this case, only a certain area of bargaining, he has refused to bargain as to whatever he has closed off, and any discussion of his good faith is pointless.

That portion of § 8 (d) of the Act which declares that an employer need not agree to a proposal or make concessions does not dispose of this case. Certainly the Board lacks power to compel concessions as to the substantive terms of labor agreements. But the Board in this case was seeking to compel the employer to bargain about subjects properly within the scope of collective

---

[2] There is similarly a difference between a union voluntarily disbanding, and the employer insisting that it disband as a condition of granting a wage increase. Cf. *McQuay-Norris Mfg. Co.* v. *Labor Board*, 116 F. 2d 748.

[3] The only exception is that an employer in good faith can challenge the majority status of the bargaining representative and request proof that it does in fact have such status. Cf. *Joy Silk Mills, Inc.* v. *Labor Board*, 87 U. S. App. D. C. 360, 369, 185 F. 2d 732, 741.

[4] *J. I. Case Co.* v. *Labor Board*, 321 U. S. 332; *H. J. Heinz Co.* v. *Labor Board*, 311 U. S. 514, 525.

bargaining.[5]   That the employer has such a duty to bargain and that the Board is empowered to enforce the duty is clear.

An employer may not stake out an area which is a proper subject for bargaining and say, "As to this we will not bargain."   To do so is a plain refusal to bargain in violation of § 8 (a)(5) of the Act.   If employees' bargaining rights can be cut away so easily, they are indeed illusory.   I would reverse.

---

[5] *National Licorice Co.* v. *Labor Board,* 309 U. S. 350, 360; *Inland Steel Co.* v. *Labor Board,* 170 F. 2d 247, 252; *Labor Board* v. *Bachelder,* 120 F. 2d 574, 577.