ASSOCIATED UNIONS OF AMERICA, INSURANCE EMPLOYEES LOCAL 65, v. NATIONAL LABOR RELATIONS BOARD.

No. 10635.

United States Court of Appeals Seventh Circuit.

Nov. 28, 1952.

Max Raskin, Milwaukee, Wis., for petitioner.

George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Marcel Mallet-Prevost, Nancy M. Sherman, Attys., National Labor Relations Board, Washington, D. C., for respondent.

Before KERNER, FINNEGAN, and SWAIM, Circuit Judges.

KERNER, Circuit Judge.

Petitioner, herein called the Union, has petitioned to review and set aside an order of the National Labor Relations Board, dismissing an unfair labor practices complaint issued against Old Line Life Insurance Company of America, hereinafter called the Company. The Company is engaged in commerce within the meaning of the Act, and no jurisdictional question is here presented. The proceedings before the Board were initiated by the Union, charging that the Company had negotiated with the Union without any sincere purpose to reach an agreement, in violation of § 8(a) (5) and (1) of the Act; that this unlawful conduct had caused and prolonged a strike among the Company's employees; and that, therefore, the Company's rejection of certain strikers' unconditional application for reinstatement on the ground that their positions had been filled violated § 8(a)(3) and (1) of the Act.[1]

---

1. 29 U.S.C.A. § 151 et seq., 49 Stat. 449, as amended, 61 Stat. 136 (1947).

The Trial Examiner held that the Company refused to bargain in good faith with the Union respecting a job evaluation plan, the revision of an existing pension plan, the modification of expiring contractual provisions concerning promotions, job vacancies, and seniority, and the furnishing of certain wage information, and that the Company's unfair practices had caused the strike. He recommended that the striking employees be reinstated, and that the Company be ordered to bargain collectively with the Union and embody any understanding reached, in a signed contract.

The Board adopted the Examiner's credibility determinations and his findings with respect to the controlling facts, but upon review of the entire record, it found that the strike was economic in character and that the strikers whose positions had been filled were not entitled to reinstatement, and concluded that the preponderance of the evidence failed to establish that the Company's negotiations with the Union had not been conducted in good faith as required by the Act; that the Company's position on the subject of promotions and related matters did not constitute a violation of § 8(a)(5) as a matter of law, and that although the Company's counterproposal reserved unilateral control in the Company, "it was not so much the [Company's] counterproposal as the Union's uncompromising insistence on the adoption of a promotional policy that prevented agreement." 96 N.L. R.B. No 66.

The Company is engaged in the soliciting and issuing of life, accident, health and hospital insurance policies, and in the investment of funds in real estate and other securities in Wisconsin and several other States. In December, 1946, the Union was certified by the Wisconsin Labor Relations Board as the bargaining representative of the Company's non-supervisory home office employees. Pursuant thereto, the Company and the Union entered into a series of collective bargaining agreements, the first of which took effect in May, 1947, and the last, on May 1, 1949.

On February 28, 1950, the Union notified the Company of its desire to amend the 1949 contract, and in its letter set forth specific proposals. It asked that the job evaluation plan then being developed by the Company be submitted to the Union for study; that it wished to discuss the provisions of a revised pension plan, and asked for a general salary increase, an increase in the paid vacation, a union shop, lunch room facilities, and for certain changes regarding promotions, transfers, terminations, and reemployment.

With respect to promotions, the contract provided that "length of service shall be determinative only when ability, qualifications, and experience are relatively equal. The Company shall be the judge of ability, qualifications and experience of all employees." The Union asked that these provisions "be amended to provide [for] * * * the application of adequate seniority provisions to promotions, transfers, terminations, and reemployment," and demanded a revision of the clause in the contract providing that each employee was entitled "to information as to the Company's evaluation of his performance" at an interview with his supervisor on the anniversary date of his employment.

The first bargaining meeting was held on March 22, 1950, and the last, on August 2, 1950. At the first meeting the Union proposed that the grievance procedure in the existing contract be extended to include grievances regarding promotions, and that a job-posting procedure be adopted providing for the settlement of promotional disputes through an arbitration procedure. The Company pointed out that 98 percent of all promotions were made from within the Company on the seniority basis, and took the position that determining the skill and qualifications of the employees, where seniority was not followed, was a management problem. The Company did not insist upon unilateral control over promotions. It offered, as a counterproposal, to continue the existing contractual provisions, and suggested a provision requiring it to negotiate promotions before effecting them. The Union, however, insisted upon its own proposal.

On this issue, the Union cites Aluminum Ore Co. v. National Labor Relations

Board, 7 Cir., 131 F.2d 485, 147 A.L.R. 1, and National Labor Relations Board v. J. H. Allison & Co., 6 Cir., 165 F.2d 766, 3 A. L.R.2d 990, and makes the point that the Company's insistence on retaining final authority over promotions was indicative of bad faith. On this question the Board held that the Act "only requires an employer in good faith to negotiate contemplated promotions * * *." We agree with the Board that the Act did not require the Company to accept any promotional plan it did not, in fact, find agreeable, and support is found for that proposition in what was said in National Labor Relations Board v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824. In that case the Supreme Court, 343 U.S. at page 404, 72 S.Ct. at page 829 said: "That Section [§ 8 (d)] contains the express provision that the obligation to bargain collectively does not compel either party to agree to a proposal or require the making of a concession." Hence, in the circumstances here appearing, we think the Board was not compelled to find that the Company was negotiating in bad faith.

The job evaluation plan. There is no evidence that the Company at any time refused to bargain with the Union concerning a job evaluation plan, nor that the Union proposed one of its own. Nevertheless, the Union contends that because the Company had not formulated such a plan as provided for in the 1949 contract, the "only conclusion that can be logically inferred is that the Company had no desire to institute a job evaluation program" and was "engaged in delaying tactics which manifest a lack of good faith."

At the first meeting, and at the meeting of April 5, the Union inquired about the progress of the job evaluation study. The Company explained the procedure it was using in working on the study and informed the Union it was considering several types of plans, and asked the Union to wait until the study was completed. In this connection the record discloses that shortly after the execution of the 1949 contract the Company appointed a committee to work out a job evaluation program. This committee, with the Union's approval, decided to complete the job by means of outside help. After making an independent study of job evaluation programs in the insurance field, and finally deciding to accept as authoritative a report issued by an association of insurance companies toward the end of 1949, which suggested three types of job evaluation plans, the Company decided upon one of the three types of plans recommended by the association and began to obtain from each employee in the bargaining unit a job description approved by his supervisor. This was the status of the matter at the time of the last bargaining meeting in August, 1950.

■ On this question, the Union contends that the delaying tactics of the Company were evidence that the Company was not bargaining in good faith, and National Labor Relations Board v. Athens Mfg. Co., 5 Cir., 161 F.2d 8; Inland Steel Co. v. National Labor Relations Board, 7 Cir., 170 F.2d 247, 12 A.L.R.2d 240; and W. W. Cross & Co. v. National Labor Relations Board, 1 Cir., 174 F.2d 875, are cited. However, each case must turn upon its own facts, and the applicable rule requires fair appraisal of the circumstances and the particular facts of the particular case. Majure v. National Labor Relations Board, 5 Cir., 198 F.2d 735.

■ The Board found that when the subject of job evaluation was brought up, the Company explained why the plan was not yet ready. It told the Union that after spending much time exploring a number of plans it had selected one, and that it was then obtaining job descriptions from employees which would have to be checked by their supervisors, and that as soon as the plan was completed, it would present it to the Union for consideration. In this situation we think the Board was warranted in concluding that the Company was not shown to have been acting in bad faith.

■ The pension plan. At the meeting held on March 22 the Union asked for changes in the pension plan. It proposed to amend the existing plan which the Company had instituted before the Union became the bargaining representative of the employees, so as to provide certain vested

rights in the plan, and proposed that the benefit committee which administered the plan include two employees chosen by the Union. The Company explained that legislation then pending before Congress contemplated changes in the social security benefits available to retired employees and that such changes would have to blend into any benefits available to them under the Company's pension plan, and it took the position that it was unwilling to make any changes at that time because it felt it desirable to await the disposition of the pending legislation which was likely to affect the employees' rights under the pension plan.

Here again the Union argues that the Board improperly applied the law in concluding that the Company did not fail to bargain in good faith. We find no merit in this contention. The Board held that the Company at all times recognized that a pension plan was a bargainable matter, and that it promptly agreed to incorporate the plan into a contract when the Union requested it for the first time at the meeting of July 11, and the Board found "at most an honest disagreement after full discussion of the matter," and that the Company simply declined to make changes at that time, because of the pending legislation. And the Board concluded that the Company's refusal to accept the Union's proposed revisions after full and open discussion did not demonstrate a disregard of its statutory obligations. In this state of the record it is clear that the Board had no choice but to conclude that the evidence failed to establish that the Company had refused to bargain with the Union in good faith, as required by § 8(a)(5),(d) of the Act.

The Union's request for information. It appears that at the meeting of February 8, Parry, the Union's president, asked for a list of all the employees in the bargaining unit, including their dates of employment, wages, and merit increases. He said that the Union needed the list because the information which had been furnished on a monthly basis was incomplete and inaccurate. Ryan, the Company's representative, pointed out that during prior bargaining negotiations in May, 1949, the Company had agreed to furnish the Union with a monthly list of such information in order to avoid the burden of having to compile such information while conducting future bargaining, and that these monthly statements should be sufficient for the Union's purpose. At the May 9 meeting the Union renewed its request that the Company submit a complete list of all employees who had been in the bargaining unit for the past year, showing dates of hire, salaries at the time of hire, merit increases or promotions, and classifications. The Company again pointed out that it had been supplying such information on a monthly basis since the execution of the 1949 contract, and offered to check the Union's information against its master lists, but the Union refused. However, at the May 16 meeting, the Company agreed to the Union's request.

The last meeting before the strike was held on June 19, under the auspices of a federal conciliator. The Union repeated the demands which it had made during the negotiations. On June 26, the employees struck. By letter, dated June 28, the Union repeated some of its previous demands, modified others, and added several which it had not previously made. It repeated its request for modification of the pension plan which had not been discussed for almost two months, and for the first time asked for its inclusion in the contract, and requested the Company to furnish the merit rating review data which the Company had used for awarding merit increases for the past year; to bargain all proposed merit increases with the Union; to use a joint Company-Union approved merit rating plan for determining employees' relative job qualifications; and to institute a joint Company-Union job evaluation plan administered by a committee on which the Company and the Union were to be equally represented.

At a meeting on July 11 the Union repeated the demands set out in its letters of February 28 and June 28, except that it asked for up-to-date wage information. The Company again explained that it did not wish to modify its pension plan until the pending social security legislation was dis-

posed of, and expressed the opinion that one employee representative on the benefits committee was sufficient since the duties of the committee were purely administrative; however, it agreed to incorporate the plan into any bargaining agreement made, but declined to furnish the merit rating review data on the ground that it was relevant only to increases which had already been granted pursuant to the 1949 contract and after the individual interviews with the employees involved. It rejected the proposed joint merit rating plan, and again explained its opposition to the union shop, and said that it did not think the Union should participate in the formulation of the job evaluation program until the Company had completed work on it.

On July 14, in response to the Union's request for wage information, the Company furnished the Union with a list of all employees and their salaries as of June 23. By letter, dated July 28, the Company declined to furnish a list of its employees after the strike began, and again declined to furnish the Union with the rating review data of all employees in the unit for the past year, on the ground that the contract still permitted it to make merit increases in its discretion.

As already noted, the last meeting was held on August 2. At this meeting the Company rejected the Union's proposal regarding job posting on the basis of a joint merit plan, but promised that on the occasion of the employees' annual individual interviews preceding such determination, it would permit the Union to inspect merit rating data regarding the employee whose wages were under consideration. The Union rejected this suggestion.

The Board found that the negotiations, which were resumed during the strike, covered substantially the same grounds that were covered in the prestrike negotiations and in the Union's new demands. It found no evidence that the Company approached the bargaining table other than with a sincere desire to reach an agreement; the Company fully discussed the status of the job evaluation program and offered to obtain outside assistance to help complete the job, and thereafter to negotiate differ-

ences; it agreed to the Union's new proposal to incorporate the pension plan into a contract; it modified its earlier position and agreed to discuss in advance with the Union contemplated promotions and offered a similar proposal with respect to merit increases, and furnished the Union with wage data and offered to make available to the Union merit review data. Upon these facts, the Board concluded that whatever the reason for the parties' inability to reach agreement during the strike, it was not bad faith bargaining on the Company's part.

Having in mind the admonition of the Supreme Court that we are charged with the primary responsibility for reviewing the conclusions of the Board, National Labor Relations Board v. Pittsburgh Steamship Co., 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479, we find, upon consideration of the whole record, that there is no basis for a finding that the Company was acting in bad faith. On the contrary, we think the Company was acting within its rights, and that the Board correctly applied the statutory standard of good faith bargaining to the facts. Compare National Labor Relations Board v. American National Insurance Co., 343 U.S. 395, 409, 72 S.Ct. 824.

Finally we reach the question whether the Board erred in refusing to reinstate certain employees whose jobs had been filled during the strike by new employees. It appears that, in accordance with the terms of the current contract, the Company, on August 15, gave the Union a five-day notice of termination. On September 27, the Union requested further negotiations. By letter, dated October 6, the Company refused to meet further with the Union on the ground that it doubted the Union's majority. The record shows that 14 of the 75 employees in the bargaining unit at the time of the strike did not participate in the strike; that between the beginning of the strike and October 6 the Company had hired approximately 46 new employees; and that the Union had informed the Company that some of the strikers did not wish to return to their jobs.

By letter, dated November 28, 1950, the Union notified the Company that the Union had voted to terminate the strike and that

all of the strikers wished reinstatement to their former jobs. The Company reinstated all of the strikers who applied, except that it declined to accept 29 on the ground that their positions had been filled; declined to rehire one employee on the ground that her job had been eliminated; declined to rehire another on the grounds that her job had been eliminated and that she had engaged in misconduct during the strike; and declined to rehire still another employee on the ground that she had engaged in misconduct during the strike.

The Board found that the strike was not caused or prolonged by unfair labor practices but was purely economic in character; that the Company's refusal to reinstate the employees whose jobs had been filled by new employees was permissible and hence did not constitute a violation of § 8(a)(1) and (3) of the Act. We find no error in this conclusion. Consequently, the Union's prayer to vacate the order of the Board must be denied. It is so ordered.