**ALLIS–CHALMERS MFG. CO.**

v.

**NATIONAL LABOR RELATIONS BOARD.**

No. 10991.

United States Court of Appeals,
Seventh Circuit.

May 21, 1954.

W. J. McGowan, J. L. Waddleton, Milwaukee, Wis., Gerard D. Reilly, Washington, D. C., Maxwell H. Herriott, Milwaukee, Wis., Lines, Spooner & Quarles, Milwaukee, Wis., Reilly, Rhetts & Ruckelshaus, Washington, D. C., of counsel, for petitioner.

David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Owsley Vose, Atty., George J. Bott, Gen. Counsel, National Labor Relations Board, Washington, D. C., Irving M. Herman, Atty., National Labor Relations Board, New York City, for respondent.

Before MAJOR, Chief Judge, and LINDLEY and SWAIM, Circuit Judges.

MAJOR, Chief Judge.

This case is here upon petition of Allis-Chalmers Manufacturing Company (herein called the Company or petitioner) to review and set aside an order of the National Labor Relations Board (herein called respondent or the Board), issued against the Company on August 26, 1953, pursuant to § 10(c) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq. In its answer to the petition the Board requests enforcement of its order.

The complaint filed by Office Employees International Union, Local 19, AFL (herein called the Union), charged the Company with the unfair labor practice of refusing to bargain. A hearing was had before a trial examiner who made a report adverse to the Company. The Board sustained the recommendations of the examiner and entered the order now under attack, directing the Company (1) to cease and desist from (a) failing or refusing to bargain collectively with the Union, (b) insisting upon the strike vote and ratification clauses or any other proposals not involving conditions of employment to the point of breakdown of negotiations with the Union, (c) in any like or related manner interfering with, restraining or coercing employees in exercise of rights guaranteed by § 7 of the Act; and (2) upon request, to bargain collectively with the Union with respect to wages, hours and other conditions of employment and embody any understanding reached in a signed agreement.

The contested issue as stated by the Board is whether it properly held that the Company's insistence, to the point of breakdown in the negotiations, on further consideration and discussion of the contract ratification and strike authorization clauses as a condition to fulfillment of its bargaining obligation, constituted a refusal to bargain in violation of § 8(a)(5) of the Act. The Company poses the contested issues thus: (1) Is the Company's strike vote clause (Article XIII) a statutory proposal? and (2) Did the Company conduct negotiations on the strike vote clause (Article XIII) and the ratification clause (Article XIV) in such a manner as to constitute a refusal to bargain in violation of § 8(a)(5) of the Act, assuming *arguendo* that such clauses are not statutory proposals? The Company contends, and the Board disputes, that any issue relevant to the Company's proposed ratification clause is moot.

As will be subsequently shown, there is hardly room for doubt but that lengthy negotiations carried on between the Company and the Union were abruptly terminated by the latter. It is the theory of the Board, however, upon which its decision is predicated, that the Company by its insistence upon its strike vote and ratification proposals as a prerequisite to a continuation of negotiations justified the Union in its refusal

to bargain further because the two proposals were not encompassed within the terms of the statute which requires the employer and the representative of the employees to confer in good faith "with respect to wages, hours, and other terms and conditions of employment". Section 8(d) of the Act. See also § 9(a) of the Act.

It thus appears that the first and most important issue is whether the ratification and strike vote clauses proposed by the Company are included within the statutory language, "other terms and conditions of employment". If so, the proposals are statutory, requiring the party to whom they are made (in this case the Union) to bargain concerning the same in good faith. If not, they cannot be insisted upon by the proposer to the point of creating an impasse in negotiations. More specifically, as applied to the instant situation, if the Company's proposals were statutory the Union was obliged to bargain in good faith relative thereto, even though they might not be able or willing to reach an agreement. If they were not statutory, there may be some question as to what duty, if any, the Union had to bargain but, in any event, they could not be utilized by the Company to the point of causing a breakdown in negotiations. If this statutory proposal issue be decided adversely to the Board, there is no further issue which requires consideration or decision. If it be decided adversely to the Company, there remains its contention that in any event the ratification and strike vote proposals were not urged to the extent of affording the Union a valid reason for terminating its negotiations with the Company. Admittedly, the issue as to whether the Company's proposals were statutory is one of law.

Notwithstanding the lengthy recital contained in the examiner's report and in the briefs of the parties, we think a brief statement of the facts will suffice, particularly as they bear upon the legal issue for decision. The Company, with its principal place of business at Milwaukee, Wisconsin, is engaged in the manufacture and sale of machinery and farm equipment and it owns and operates manufacturing plants at many points, including its Tractor Division at Toledo, Ohio. It has approximately 35,000 employees and, since 1937, has engaged extensively in collective bargaining with various CIO, AFL and independent Unions and has existing collective agreements with Unions representing fourteen separate bargaining units. On November 17, 1950, the Board, on the basis of a consent election, certified the Union (which represents employees of several employers in the Toledo area) as the exclusive representative for a collective bargaining unit comprised of seven office employees at the Company's Toledo office.

The bargaining negotiations between the Company and the Union fall into two categories, namely, those of 1951 and 1952. We perceive no occasion to relate the facts relative to the 1951 negotiations as it is admitted that the present controversy arises from those conducted in 1952. Negotiation meetings were held at Toledo between the respective parties on February 13, 14, 20, 21 and 22, 1952, at and during which, proposals and counter-proposals were submitted and discussed. Three of such proposals made by the Company (referred to jointly as the "democratic processes" clauses) were designated as (1) a union elections clause (Article II, Sec. E), (2) a strike vote clause (Article XIII) and (3) a ratification clause (Article XIV). These proposals were submitted for the first time on February 22. They were objected to by Taylor (Union business manager), and the Company proposed that it would revise and submit a composite proposal for a complete agreement. On March 3, 1952, the Company submitted to Taylor a revised draft of the proposed agreement, which he presented to the International Union Office and Union counsel at Cleveland for consideration. At a meeting on March 20, 1952, participated in by International representative Daugherty, Taylor presented to the Company a letter, repeating the Union's ob-

jection to the "democratic processes" clauses, in which letter it was stated that both Articles XIII and XIV were unacceptable to the Union because they "permit interference with the internal affairs of the Union and moreover are of doubtful legality," and that "We cannot enter into an agreement which by insistence of an employer in effect constitutes an amendment of our Constitution and By-laws by individuals who are not even Union members." Daugherty agreed with Taylor's position and stated that there was little need for a further meeting if the Company continued to insist on those clauses.

At the Company's insistence, however, further meetings were held on March 28 and April 11, 1952. On April 17, 1952, the Company forwarded to Taylor a revised counterproposal for a complete agreement and invited negotiations thereon. In this proposal the union elections clause was deleted. The strike vote clause (Article XIII) as thus redrafted provided:

> "This agreement shall remain in force for a period of one (1) year from date of execution hereof and thereafter from year to year unless, within the ten (10) day period immediately preceding the sixty (60) days prior to any date of termination written notice of termination is given by either party.
>
> "If a new agreement cannot be reached within the sixty (60) day period, then the agreement shall be automatically extended for an additional thirty (30) days.
>
> "If a new agreement cannot be reached within such thirty (30) day period or thereafter, the Union shall have the right to conduct a strike provided a majority of the employees in the bargaining unit shall have voted in favor thereof in a secret ballot referendum held under the supervision of an impartial State or Federal Agency designated by the Union. If desired by the Union, such vote may be conducted

on Company premises during working hours at Company expense."

The essential change in the redrafted proposal is found in the third paragraph. Originally it was proposed that the secret ballot strike referendum be held on Company premises and at Company expense, which was changed in the final proposal to provide for a secret ballot referendum held under the supervision of an impartial State or Federal Agency designated by the Union. The Union raised no issue as to the first two paragraphs of the proposal; it was the third paragraph to which it objected.

The ratification clause (Article XIV) in its original form provided that any agreement entered into between the Company and the Union should be "subject to ratification by the affirmative vote of the majority of the employees in the unit in a secret ballot on the next work day following the date of execution, conducted on Company premises under the supervision of the Federal Mediation and Conciliation Service or other agency mutually satisfactory to the parties." This clause as finally submitted made an agreement reached "subject to secret ballot, or written, ratification by a majority of the employees in the bargaining unit. If desired by the Union, a ratification vote by supervised secret ballot may be conducted on Company premises."

While the parties cite numerous cases by way of analogy, we are aware of no case, decided either by the Labor Board or the courts, where the precise question here presented has been decided. As the trial examiner stated in his report, "Despite almost 2 decades of judicial interpretation and substantial Congressional amendment of the original Act, the scope of bargaining rights and obligations has not yet been so clearly delineated that one can say with certainty what solution will ultimately become settled law. The fact is that as our labor relations policy has matured the bargaining area of the Act has become the subject to extensive exploration only relatively recently. The phrase 'conditions of employment,' for example, has not yet acquired precise

definition. Similarly imprecise is the line between what is basic statutory policy—which must prevail—and what is merely a statutory privilege—which may be subordinated."

We start with the conceded premise that a proposal for a non-strike clause is statutory, that is, within the area of collective bargaining. Relative thereto, the trial examiner in his report stated: "It is true—as I understand the Board's decision in the Shell Oil Co. case, 77 NLRB 1306,—that a no-strike clause *effective during the term of the substantive agreement* is bargainable to the point of impasse; and an employer may refuse to contract without it." And the Board in its brief states: "It should be noted at the outset that Article XIII was not a no-strike clause. A no-strike clause for the duration of the contract had in fact been agreed upon by the parties and is concededly within the area of compulsory bargaining." See also National Labor Relations Board v. American Nat. Ins. Co., 343 U.S. 395, 408 (footnote 22), 72 S.Ct. 824, 96 L.Ed. 1027.

The Board in its brief distinguishes the instant strike vote clause from a no-strike clause thus: "Here the provision in question is nothing more than an effort by the Company to dictate to the employees, and their chosen bargaining representative, the mechanics to be utilized in determining whether to go out on strike. This concern with the internal procedures of the statutory representative clearly does not relate to 'terms and conditions of employment,' and hence is outside the area of compulsory bargaining."

In our view, this asserted distinction is without substance. That employees are possessed of a right to strike, protected by the Act (with certain limitations not here material) is not open to question. That they as principals have a right through their duly certified bargaining representative as their agent to waive such right must be inherent in the concession that a no-strike clause is

statutory. And if the employees can waive it in one instance, we see no reason why they may not do so in the other. Neither do we think that the present proposal constitutes an effort by the Company "to dictate to the employees, and their chosen bargaining representative, the mechanics to be utilized in determining whether to go out on strike" different from that which could be ascribed to the no-strike clause. In the one instance, the employees waive their statutory protected right to strike during the duration of the contract; in the other, they waive the same right under different circumstances, that is, after the contract termination. And if the Company has a statutory right, as is conceded, to bargain as to this waivable right in the one instance, it would seem that it is entitled to such right in the other. True, there may be a difference in the two situations. Such difference, however, does not affect the right of the employer to propose and to insist on bargaining; it may affect the decision of the Union as to whether it will accept or refuse the proposal.

The decision in National Labor Relations Board v. American Nat. Ins. Co., 343 U.S. 395, 72 S.Ct. 824, involved a question different from that presented here, to which we shall subsequently refer, but at this point we note some of the observations made by the court in reaching its decision. There, the Board contended that the clause proposed by the employer was *"per se"* a violation of the Act in 343 U.S. at page 405, 72 S.Ct. 824. The court stated in 343 U.S. at page 408, 72 S.Ct. at page 831: "The Board was not empowered so to disrupt collective bargaining practices. On the contrary, the term 'bargain collectively' as used in the Act 'has been considered to absorb and give statutory approval to the philosophy of bargaining as worked out in the labor movement in the United States'", a quote from Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 346, 64 S.Ct. 582, 88 L.Ed. 788. The court further stated in 343 U.S. at page 409, 72 S.Ct. at page

832: "The duty to bargain collectively is to be enforced by application of the good faith bargaining standards of Section 8(d) to the facts of each case rather than by prohibiting all employers in every industry from bargaining for management functions clauses altogether." Further the court stated in 343 U.S. at page 410, 72 S.Ct. at page 832: "Accepting as we do the finding of the court below that respondent bargained in good faith for the management functions clause proposed by it, we hold that respondent was not in that respect guilty of refusing to bargain collectively as required by the National Labor Relations Act."

In the instant case, it is not disputed, in fact it is tacitly conceded, that the Company proposed and bargained in good faith, and we think the same can be said of the Union. The termination of the bargaining negotiation was the result of an error of judgment, either on the part of the Company or that of the Union. If the clauses proposed were non-statutory, the error was on the part of the Company; if they were statutory, it was on the part of the Union.

The trial examiner, under the heading "The Background for the Clauses," relates in considerable detail, too lengthy to repeat here, the reasons for the proposals in dispute, as well as numerous instances where similar proposals have been embodied in labor contracts, particularly the strike clause proposal. Briefly, instances are cited where strike elections conducted by the Union were determined by the use of forged ballots, and others where the circumstances cast doubt upon the validity of the election and the result. Following these experiences, the Company in 1946, in its bargaining with different Unions, proposed clauses similar to those here in dispute. In that year, the Company negotiated a similar strike clause into contracts at its Springfield, LaCrosse, Pittsburgh and Boston plants, and in 1949, at Norwood. These contracts were with the CIO. A similar contract was negotiated with the Union at the Gadsden plant in 1948. In 1950, the strike clause now in dispute was accepted by the UAW at the Company's plants in Pittsburgh, Springfield, LaCrosse and Gadsden, and by the CIO at Norwood and Boston. Numerous Unions of the AFL accepted the proposal at West Allis and LaPorte.

The trial examiner concluded his review of the background and history of these clauses with the following statement: "It is thus seen that the clauses offered here by the Company on these subjects reflect a continuous, developmental, and largely successful policy of several years standing to negotiate the principles of the proposals into its collective bargaining contracts." The trial examiner in his conclusions as to the effect to be given this background and history stated: "Most persuasive of the legality of Article XIII is the fact that it has been accepted by large international unions, and represents negotiated policies. History and current practices are strong, sometimes conclusive, evidence as to what are appropriate subjects of negotiation. The law of collective bargaining will be of little public utility if it ignores settled bargaining practices not intrinsically unlawful. In some instances those practices may be of such common standing as to be of controlling weight in determining the legal breadth of the obligation to bargain. In all instances they must at least be considered and weighed."

The examiner, however, concluded that the bargaining history did not establish that the proposed clauses "represent conditions of employment bargainable to the point of impasse." This conclusion was reached after the examiner had pointed out that the Company had a right to bargain with the Union regarding the disputed clauses and to attempt to persuade the Union to accept them. The pronounced history, however, appears to have been cast aside by the examiner on the speculative reasoning that the many Unions which had previously accepted such clauses might have done so for the "sake of larger gain." We believe it more reasonable to think, and this perhaps is also speculative, that they have

accepted these proposals in recognition that they were proper matters for bargaining and negotiation.

Returning to the American Nat. Ins. Co. case, the Company there, in response to an arbitration clause proposed by the Union, submitted a counter-proposal designated as a "management function" clause, relating to such matters as hiring, promotion, discipline and work schedule as the responsibility of management and excluding such matters from arbitration. More specifically, the proposed clause made the matters covered the responsibility and prerogative of management, about which the decision of management should be final. The examiner attempts to distinguish this case on the basis that the clause there was "dealing with terms and conditions of employment." The significant point is, however, that the Board in that case contended, as pointed out by the court 343 U.S. at page 407, 72 S.Ct. at page 831: "The Board considers that employer bargaining for a clause under which management retains initial responsibility for work scheduling, a 'condition of employment,' for the duration of the contract is an unfair labor practice because it is 'in derogation of' employees' statutory rights to bargain collectively as to conditions of employment."

Thus, there as in the instant case it was the theory of the Board that the disputed proposal, if accepted, depreciated the power of the Union as a bargaining agent. It seems to us that the argument of the Board in that case was more plausible than it is here because the proposal there included matters concerning which the Union had a statutory right to bargain, while here the statute confers no right upon a Union to strike or to call a strike, its sole authority in that respect being obtained from the employees. To state the reasoning differently, the proposal of the Company in the American Nat. Ins. Co. case, if accepted by the Union, constituted a deletion of bargaining matters specifically delegated to the Union by the Act. In contrast, the proposed clause here does not impair any right delegated to the Union by the Act; any impairment involved relates to a right which the Act preserves to the employees. As previously stated, we perceive no reason why they may not waive such right, subject to their approval obtained in a referendum. While it may be conceded that the American Nat. Ins. Co. case is not decisive of the question here for decision, we are much of the view that its rationale militates strongly against the Board's contention.

The Board relies upon many cases in support of its contention that adamant insistence of either party on matters other than "terms and conditions of employment" constitutes a refusal to bargain. This contention is not in dispute and the cases cited in support thereof need not be discussed. Furthermore, whether a proposal in controversy comes within the purview of the statutory language which defines the matters concerning which the parties are entitled to bargain depends upon the facts of each case. The two cases, however, most strongly relied upon by the Board and the only two cases cited by the trial examiner on the contention under discussion are N.L.R.B. v. Corsicana Cotton Mills, 178 F.2d 344, and N.L.R.B. v. Dalton Tel. Co., 187 F.2d 811, both decisions by the Fifth Circuit Court of Appeals. Neither of these cases, in our opinion, supports the argument which the Board now advances.

In the Cotton Mills case, the clause proposed by the employer required the Union to notify non-member employees of Union meetings, permit them to attend and vote on every decision of the Union as bargaining agent, each such decision to be valid only upon majority vote of all the employees who attended such meeting. The court held in 178 F.2d page 347 that by this proposal the Company sought to withhold "recognition from the union as bargaining agent". We see no occasion to take issue with that conclusion but it is not discernible how it supports the Board's contention here, particularly in view of the later decision of the Supreme Court in the American Nat. Ins. Co. case, supra.

In the Dalton Tel. Co. case, the employer and the Union had agreed on all substantive issues, and then the employer demanded that the Union register with a Georgia court in a manner provided by the Georgia Code so as to make said Union subject to suit on its contract. Concerning this demand on the part of the employer, the court stated in 187 F.2d at page 812: "Respondent, by insisting that the union become an entity amenable to suit in the state courts, left the sphere of 'terms and conditions of employment,' and conditioned his willingness to sign the agreement on a matter outside the area of compulsory bargaining." We agree that the question there presented was decided correctly but, in our judgment, it does not have the slightest bearing upon the issue with which we are presently concerned.

█ Our discussion has been directed in the main to the strike vote proposal (Article XIII) but what we have said is, in our opinion, also applicable to the ratification proposal (Article XIV). Both of these proposals admittedly were made by the Company in good faith and, in our view, contained matters about which the Union was compelled to bargain on the same level. At any rate, we are confident that the Union was not relieved from its obligation to bargain for the reason stated, that is, that the acceptance of the proposals by the Union would "permit interference with the internal affairs of the Union." It is not difficult to visualize a proposal the acceptance of which would produce such a result. But we think the basis for the application of this principle is non-existent where, as here, the Union is the representative of all employees in the bargaining unit, members and non-members alike. Such being the case, neither reason nor logic supports the theory that the Company is without statutory authority to bargain to the limit for a contract provision which would permit all employees to have a voice in a determination of the matters included in the instant proposals. To hold otherwise means that non-Union members for whom the Union has been certified as the bargaining agent are always without right to express their desires concerning matters of vital importance to them. To us it is a specious argument that non-Union members may be thus cast into oblivion on the pretext that to recognize them would amount to an interference with the internal affairs of the Union.

█ Notwithstanding what we have said, we think there is merit in the Board's contention that the Company was not entitled to insist to the point of an impasse upon proposals which required approval by a majority of the employees of the bargaining unit. While § 9(a) of the Act provides for the selection of a bargaining agent "by the majority of the employees in a unit appropriate for such purposes," it is settled that the selection is to be determined by a majority of the employees who participate in an election. This is in accordance with the democratic process universally sanctioned. N.L.R.B. v. A. J. Tower Co., 329 U.S. 324, 331, 67 S.Ct. 324, 91 L.Ed. 322. However, assuming that which we do not decide, that is, that the proposals under consideration were defective in that they required affirmative action by a majority of the employees of the bargaining unit rather than by a majority of those participating in an election, our conclusion is no different. This is so for the reason that the Union, as we have shown, broke off negotiations because the proposals, if accepted, would "permit interference with the internal affairs of the Union." No objection was made to the proposals because their acceptance would have required affirmative action by a majority of employees of the unit rather than by a majority participating in an election. The Union could have, by counter-proposal or otherwise, sought a modification of the proposals, including the provisions under discussion. This it did not do. Under these circumstances we think we are not called upon to decide whether the Company had a statutory right to insist upon its proposals in the precise form presented. The point is that the proposals were such as to demand of the Union bargaining in good faith. This, as we have

shown, it refused to do, on a basis which was without justification.

The conclusion thus stated makes it unnecessary to decide or discuss other questions which have been raised and argued. The Board's order is set aside and its request for enforcement is denied.