Wilbur K. Miller, Senior Circuit Judge, dissented.

UNITED STEELWORKERS OF AMER-
ICA, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

H. K. PORTER COMPANY, INC., DIS-
STON DIVISION–DANVILLE
WORKS, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

United Steelworkers of America,
AFL–CIO, Intervenor.

Nos. 19492, 19507.

United States Court of Appeals
District of Columbia Circuit.

Dec. 8, 1967.

Messrs. Elliot Bredhoff, Michael H. Gottesman and George H. Cohen, Wash-ington, D. C., were on the motion for petitioner in No. 19,492 and intervenor in No. 19,507.

Messrs. Daniel W. Sixbey and Bartholomew Diggins, Washington, D. C., were on the opposition for petitioner in No. 19,507.

Mr. Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, filed an appearance on behalf of respondent.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and WRIGHT, Circuit Judge, in Chambers.

J. SKELLY WRIGHT, Circuit Judge:

In October 1961 the United Steelworkers of America was certified as the bargaining representative of the production and maintenance employees of the H. K. Porter Company's Danville, Virginia, plant. A year later the union initiated an unfair labor practice proceeding alleging that the company was not making the good faith effort to reach an agreement which Sections 8(a) (5) and 8(d) of the National Labor Relations Act require. In an unreported decision the Trial Examiner, whose decision was adopted by the Board, found that the company had indeed failed to bargain in good faith by, among other things, adamantly refusing to agree to an arbitration provision while insisting on a no-strike clause, unilaterally changing conditions of employment, and refusing to meet at reasonable times. The Examiner concluded that the company "was demanding in effect that the union relinquish the basic rights conferred by the Act or it would not receive a contract," and that the company's actions were designed to "subvert the union's position as the statutory representative." No exceptions were taken to these findings, and in July 1964 the Fourth Circuit enforced the order of the Board that the company bargain in good faith.

In the meantime the company had refused to negotiate at all, pending the Trial Examiner's decision and its approval by the Board. In October 1963

bargaining resumed, with 14 issues in dispute. By November 1964, 21 more meetings had taken place, but still no final agreement was reached. During this period 11 issues were resolved; the union conceded 10, while the company, 10 months after the Trial Examiner's decision requiring it to do so, finally withdrew its demand for a no-strike clause. Thus, when this second round of negotiations broke down, three issues remained unresolved: checkoff, wages and insurance.

The union had pressed for a checkoff at almost every bargaining session, but the company repeatedly refused to collect the dues of voluntarily paying members because dues collection was the "union's business" which the company would not foster or promote. On several occasions the union offered to withdraw its demand for a checkoff if the company would permit union stewards to collect dues during non-working hours in non-working areas of the plant. But the company rejected this alternative as well.

Again the union initiated unfair labor practice charges, and again the Trial Examiner, whose decision was again adopted by the Board, found that the company had violated its duty to bargain in good faith on the checkoff issue. He concluded, from substantial evidence in the record, that the real and only reason for refusing the checkoff was to "frustrate agreement with the union." At the hearing the company's representative admitted that it made deductions from volunteering employees' wages for a variety of charitable causes and that there would be no inconvenience involved in checking off union dues; that, in fact, the company does check off union dues at certain of its other plants.

On May 19, 1966, this court affirmed the NLRB and granted the Board's cross-petition to enforce its order requiring the company to bargain in good faith. United Steelworkers of America v. N. L. R. B. (H. K. Porter Co. v. N. L. R. B.), 124 U.S.App.D.C. 143, 363 F.2d 272, *cert. denied*, 385 U.S. 851, 87 S.Ct. 90, 17 L.Ed.2d 80 (1966). In our opinion we noted an inconsistency in the Board's order. In a footnote, the Trial Examiner had said, "This is not to say that in the resumed bargaining sessions which I shall recommend, Respondent will be required to agree to some form of check off. I only find and conclude that on that issue Respondent did not heretofore bargain in good faith, and that it should be required to do so. If after such good faith bargaining the parties reach an agreement or an impasse, the requirements of the Act will have been fulfilled."

This conclusion conflicted with the Examiner's finding, in the text, that the company's refusal to grant a checkoff was solely "for the purpose of frustrating agreement with the union * * *." In our opinion enforcing the Board's order, we indicated that to permit the company to refuse a checkoff for some concocted reason not heretofore advanced would make a mockery of the collective bargaining required by the statute. Since the text of the Trial Examiner's decision controls, we ruled that his Footnote 9 should be disregarded. We also invited the Board to initiate contempt proceedings if its order, as we interpreted it, was not complied with.

In the ensuing negotiations the company and the union each urged completely different interpretations of our decree. The company took the position that the decree was merely yet another order that it bargain in good faith—this time on the issue of dues collection. Accordingly, the company proposed to discuss the possibility of making available to the union a table in the payroll office. The union, on the other hand, asserted not only that it was entitled to its statutory right to collect dues during non-working hours in non-working areas of the plant, but also that under our decision the company was obligated to agree to a contractual dues checkoff provision as well. In other words, the union interpreted the decree as entitling it to both channels of dues collection, while the company construed the decree as requiring it only to negotiate about giving

the union some space to collect its own dues.

This disagreement apparently thwarted further bargaining, and on February 28, 1967, the union moved in this court for clarification of the decree. On March 22 we permitted filing of the motion and, on the same day, denied it. However, we again invited the Board to test the competing interpretations of the decree through its contempt process. On April 3 the union wrote to the Regional Director asking that he initiate contempt proceedings; on June 22 the Board responded by letter to this request as follows:

> "The Respondent having satisfactorily complied with the affirmative requirements of the Order in the above-entitled case, and the undersigned having determined that Respondent is also in compliance with the negative provisions of the Order, the case is hereby closed. Please note that the closing is conditioned upon continued observance of said Order and does not preclude further proceedings should subsequent violations occur."

Since the Board had apparently accepted the company's interpretation of the decree as requiring only that it now bargain with the union as to some form of dues collection, on July 21, 1967, the union filed a motion in this court that we reconsider our earlier denial of its motion to clarify our decree. Permission to file is hereby granted, and to the extent of what follows, the motion to clarify is granted.

## I

■ The Trial Examiner found that the company had no valid reason to refuse a checkoff provision and had done so solely to frustrate an agreement with the union. Though there was an inconsistency in his report, which report the Board adopted *in toto*, we resolved this contradiction by interpreting the Board's order as foreclosing the company from dreaming up new reasons for refusing a checkoff. By this we did not mean to say that the Board order required the company simply to agree to a checkoff provision. Though it would not be permitted to proffer new reasons for opposing such a clause, it was still free to seek something in return for granting it. Unless it did so, a presumption of continuing bad faith could not be dispelled.

■■ We did not think that under the Board order the company could now purge itself of its bad faith and meet its Section 8(d) obligations by agreeing simply to negotiate on alternatives to a checkoff. Apparently we misread the Board's order, for the Board is apparently satisfied that the employer has complied with its duty to bargain in good faith by agreeing to such negotiations. Certainly the final responsibility for interpreting the Board's order must rest with the Board, for "the relation of remedy to policy is peculiarly a matter for administrative competence." Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941). And, indeed, it is only the Board that can initiate contempt proceedings even where its order has been enforced by a judicial decree. Amalgamated Utility Workers v. Consolidated Edison Co., 309 U.S. 261, 60 S.Ct. 561, 84 L.Ed. 738 (1940). Since the bargaining impasse may continue, however, some guidance from the court with respect to the circumstances under which checkoff may be imposed as a remedy for bad faith bargaining is in order. This case will be remanded to the Board, therefore, for reconsideration in the light of this opinion.

## II

Section 8(a) (5) of the National Labor Relations Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees * * *." The Labor-Management Relations Act extended the duty to bargain to unions, and, in Section 8(d), elucidated its meaning in some detail:

> "For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the em-

ployer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agréement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession * * *." [1]

The statute made explicit what the Board and the courts had already found by implication: that the duty to bargain collectively required the employer to make a good faith effort to reach an accord with the union.[2] So far, on two separate occasions the H. K. Porter Company has been found not to have made such an effort. The company maintains, however, that all the Board can do, despite this tainted record, is issue yet another order that the company mend its ways and begin to bargain in good faith. The company argues that the last clause of Section 8(d)—"but such obligation does not compel either party to agree to a proposal or require the making of a concession"—bars the Board from taking more drastic action.

█ We do not read Section 8(d) as prohibiting the Board from ordering a company, which has repeatedly flouted its Section 8(a) (5) duty, to make meaningful and reasonable counteroffers, or indeed even to make a concession where such counteroffers or such a concession would be the only way for the company to purge the stain of bad faith that has already soiled its position. In certain cases such action by the company may be the only means of assuring the Board,

and the court, that it no longer harbors an illegal intent.

█ Section 8(d) defines collective bargaining and relates to the determination of *whether* a Section 8(b) (5) violation has occurred and not to the *scope* of the remedy which may be necessary to cure violations which have already occurred. That is, Section 8(d) precludes the Board from concluding that an employer had violated its duty to bargain in good faith simply because he did not agree to a particular proposal or make a particular concession. Where, as here, the subject of the dispute is a mandatory subject of bargaining,[3] either party may bargain to an impasse provided such bargaining is in good faith, and so long as the employer's position is maintained in good faith, no conclusive inference can be drawn from this obstinacy alone.

But in this case the Trial Examiner found bad faith. Based on the concatenation of circumstances taken as a whole, he concluded that the company's sole purpose in refusing a checkoff was to frustrate agreement with a union that had the statutory right to bargain collectively as the chosen representative of the employees of the plant. This was an unfair labor practice, for the right to refuse a particular proposal or to make a concession may not be used "as a cloak * * * to conceal a purposeful strategy to make bargaining futile or fail." N. L. R. B. v. Herman Sausage Co., 5 Cir., 275 F.2d 229, 232 (1960). Since the company had conceded that it had no business reason for refusing the checkoff, it would have been perfectly proper for the Board to order the company to grant one in return for a reasonable concession by the union on wages or insurance—the two issues besides checkoff that remained in dispute. Indeed, it is

---

1. 61 STAT. 142 (1947), 29 U.S.C. § 158(d) (1964).

2. *See, e.g.,* N.L.R.B. v. Montgomery Ward & Co., 9 Cir., 133 F.2d 676, 146 A.L.R. 1045 (1943), *see generally* Smith, *The Evolution of the "Duty to Bargain" Concept in American Law,* 39 MICH.L.REV. 1065, 1089 (1941); Cox, *The Duty to*

*Bargain in Good Faith,* 71 HARV.L.REV. 1401 (1958).

3. N.L.R.B. v. Darlington Veneer Co., 4 Cir., 236 F.2d 85 (1956); N.L.R.B. v. Reed & Prince Mfg. Co., 1 Cir., 205 F. 2d 131, 136, *cert. denied,* 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953).

possible that in an appropriate case the Board could simply order the company to grant a checkoff.

### III

■ We recognize that the National Labor Relations Act is grounded on the premise of freedom of contract—albeit collective contract.[4] The substantive terms of the collective agreement are to be forged by the parties to it, not by the Board.[5] This ideal of freedom of contract is both a noble and a practical one,[6] and remedies which impinge on it are not to be casually undertaken. But an equally important policy of the Act is to equalize the bargaining power of employees and employers by assuring and guaranteeing the right of workers to organize and bargain collectively through their elected representatives,[7] and the major purpose behind the Section 8(a) (5) duty to bargain is to make meaningful this fundamental right of employees.[8] As the Senate Committee report accompanying the National Labor Relations Act put it:

> " * * * It seems clear that a guarantee of the right of employees to bargain collectively through representatives of their own choosing is a mere delusion if it is not accompanied

4. As the Chairman of the Senate Committee on Education and Labor, Senator Welsh, put it in 1935: "When the employees have chosen their organization, when they have selected their representatives, all the bill proposes to do is to escort them to the door of their employer and say, 'Here they are, the legal representatives of your employees.' What happens behind those doors is not inquired into, and the bill does not seek to inquire into it." 79 CONG.REC. 7660 (1935).

5. The Board may not "sit in judgment upon the substantive terms of collective bargaining agreements," for the Act does not "regulate the substantive terms governing wages, hours and working conditions which are incorporated in an agreement." N.L.R.B. v. American National Ins. Co., 343 U.S. 395, 404, 402, 72 S.Ct. 824, 829, 828, 96 L.Ed. 1027 (1952). Nor can the Board "regulate the choice of economic weapons that may be used as part of collective bargaining"; if it could, "it would be in a position to exercise considerable influence upon the substantive terms on which the parties contract. * * * Our labor policy is not presently erected on a foundation of government control of the results of negotiations." N.L.R.B. v. Insurance Agents Union, 361 U.S. 477, 490, 80 S.Ct. 419, 427, 4 L.Ed.2d 454 (1960). See generally Wellington, Freedom of Contract and the Collective Bargaining Agreement, 112 U.PA.L.REV. 467, 469–477 (1964).

6. See Kessler, Contracts of Adhesion—Some Thoughts About Freedom of Contract, 43 COLUM.L.REV. 629–630 (1943).

7. Congress stated the theory of the Act in its first section: "The inequality of bargaining power between employees * * * and employers * * * tends to aggra-

vate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners * * *." To restore equality of bargaining power it was declared to be a policy of the United States to encourage "the practice and procedure of collective bargaining." 49 STAT. 449 (1935), as amended, 29 U.S.C. § 151 (1964).

8. As the Supreme Court said in reviewing the legislative history of the Wagner Act: "It was believed that other rights guaranteed by the Act would not be meaningful if the employer was not under obligation to confer with the union in an effort to arrive at the terms of an agreement." N.L.R.B. v. Insurance Agents Union, supra Note 5, 361 U.S. at 483, 80 S.Ct. at 424. Professor Wellington has termed this the "supportive" function of the duty to bargain. "In the absence of a requirement of good faith negotiation, collective bargaining may never occur. * * * The statutory scheme of protecting organization from unfair practices and of allowing employee choice between union and no-union in such a situation would be frustrated." Wellington, supra Note 5, 112 U.PA.L.REV. at 470. As Professor Cox has put it: "The denial of recognition is an effective means of breaking up a struggling young union too weak for a successful strike. After the enthusiasm of organization and the high hopes of successful negotiations, it is a devastating psychological blow to have the employer shut the office door in the union's face. Imposing a legal duty to recognize the union would prevent such anti-union tactics and thereby contribute to the growth of strong labor organizations." Cox, supra Note 2, 71 HARV.L. REV. at 1408.

by the correlative duty on the part of the other party to recognize such representatives as have been designated * * * and to negotiate with them in a bona fide effort to arrive at a collective bargaining agreement. Furthermore, the procedure of holding governmentally supervised elections to determine the choice of representatives of employees becomes of little worth if after the election its results are for all practical purposes ignored. Experience has proved that neither obedience to the law nor respect for law is encouraged by holding forth a right unaccompanied by fulfillment. * * *" S.Rep. No. 573, 74th Cong., 1st Sess., p. 12 (1935).

██ To make sure that this primary right is fulfilled, the NLRB has been given broad remedial powers. Section 10(c) of the Act charges the Board with the task "of devising remedies to effectuate the policies of the Act." N. L. R. B. v. Seven-Up Bottling Co., 344 U.S. 344, 346, 73 S.Ct. 287, 289, 97 L.Ed. 377 (1953).[9] Where, in a particular case, two policies of the Act conflict, the Board must seek to devise remedies which will best effectuate the one at least cost to the other. Though ordering an employer to grant a checkoff obviously intrudes on freedom of contract, it may, in certain instances, be the only way to guarantee the workers' right to bargain collectively.

This court is cognizant of the fact that the Board's remedial measures have not proved adequate in coping with the recalcitrant employer determined to defeat the effective unionization of his plant by illegally opposing organizational and bargaining efforts every step of the way.[10] As Dr. Ross concluded in his landmark study of duty to bargain cases:

"7. The major shortcoming of the NLRB lies in its failure to adopt adequate and realistic remedies in those cases where the employer has unmistakably demonstrated a continuing intent to frustrate the Act." Ross, *Analysis of Administrative Process Under Taft-Hartley*, 63 LAB.REL.REP. 132, 133 (BNA 1966).[11]

When the unfair labor practices are committed in localities where hostility to the union movement may run deep, the determined employer who litigates charges often succeeds in ousting the union despite the Board's repeated findings of Section 8(a) (5) violations.[12] And the

---

9. Section 10(c), 29 U.S.C. § 160(c), authorizes the Board "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter."

10. The H. K. Porter Company has also been found to have committed unfair labor practices in connection with union election campaigns. H. K. Porter, Inc. and United Textile Workers of America, 131 N.L.R.B. 1383 (1961).

11. A special subcommittee on labor of the House Committee on Education and Labor is now considering proposed legislation, H.R. 11725, 90th Cong., 1st Sess., designed to make the National Labor Relations Act remedies more effective. And the Board itself is engaged in a study of whether it should more rigorously exercise its existing remedial powers by awarding compensatory pay for delays caused by illegal refusals to bargain. The Trial Examiner in Zinke's Foods, Inc., NLRB Case No. 30–CA–372, proposed

such a remedy, while another Examiner recommended against it in Herman Wilson Lumber Co., NLRB Case No. 26–CA–2536. *See also* Ex-Cell-O Corp., NLRB Case No. 25–CA–2377, and Int. U., United Automobile, etc. Workers of America v. N.L.R.B., Nos. 20,137, 20,185 and 20,301 (*appeals pending*), where the Board, after denying such a remedy, has asked that the cases be remanded for reconsideration of this question. As the Board said in H. W. Elson Bottling Co., 155 N.L.R.B. 714, 715 (1965): "The Board has a particular duty under Section 10(c) to tailor its remedies to the unfair labor practices which have occurred * * *." "This process requires constant reevaluation of the Board's remedial arsenal so that the 'enlightenment gained from experience' can be applied to the 'actualities of industrial relations.'" *Id.* at 715 n. 5.

12. "The collective bargaining consequences of a remedied violation depended mainly upon the nature and extent of an employer's original resistance to bargaining and

testimony of witnesses at the recently completed hearings of the House subcommittee on NLRB remedies shows that the refusal to bargain in good faith is frequently the last ditch effort of the employer to undermine the union whose organizational effort he had been unable to frustrate.[13]

The requirement that a checkoff be granted is at most a minor intrusion on freedom of contract. In a case such as this, the checkoff provision —a provision which is included in 92 per cent of all manufacturing industries labor contracts[14]—is likely to be of life or death import to the fledgling union,[15] while it is of no consequence whatever to the employer.[16] Yet if the Board can do no more than repeatedly order the company to bargain in good faith, the workers' rights to bargain collectively may be nullified. The Board is empowered to see that this does not happen. Where an employer has twice been found to have violated his duty to bargain in good faith, a checkoff in return for a reasonable concession by the union[17] may be the only effective remedy. Such a remedy "will not be disturbed 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' Virginia Elec. & Power Co. v. [National] Labor [Relations] Board, 319 U.S. 533, 540, [63 S.Ct. 1214, 87 L.Ed. 1568]." Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed 2d 233 (1964).

Remanded.

WILBUR K. MILLER, Senior Circuit Judge, dissents.

---

his persistence in delaying compliance. Litigated cases frequently differed from non-litigated cases in fundamental ways and employers who litigated charges often succeeded in ousting their unions." Ross, *supra*, 63 LAB.REL.REP. at 133.

13. Testimony before the Special Subcommittee on Labor of the House Committee on Education and Labor on H.R. 11725 (1967).

14. *See* BNA, COLLECTIVE BARGAINING NEGOTIATIONS AND CONTRACTS, p. 87:3. Most of the contracts not containing a checkoff provide for some alternative method of dues collection on company property. *Id.* at p. 87:901.

15. In the instant case, the nearest union office was in Roanoke, Virginia, 85 miles from the plant. The employees were scattered over a wide area. As we said in our original opinion, collection of dues without a checkoff would have presented the union with a substantial problem of communication and transportation.

16. "The check-off is of great consequence to the union, as it avoids the necessity of collecting dues each and every week. It is of small consequence to the employer, especially if the union agrees to bear the additional expenses." *Supplemental statement of Frank Thompson, Jr., Chairman, Special Subcommittee on Labor,* September 14, 1966, HEARING BEFORE THE SPECIAL SUBCOMMITTEE ON EDUCATION AND LABOR, HOUSE OF REPRESENTATIVES, 89th Cong., 2d Sess., p. 77 (1966). In fact, the Subcommittee recommended that the simple refusal to agree to a checkoff paid for by the union should itself be recognized "as a criteria of bad faith bargaining" and "an indication of anti-union animus." *Ibid.* In the instant case the company admitted that it had no business reason for opposing the checkoff.

17. The Board has not undertaken to oversee the reasonableness of the substantive terms of collective bargaining contracts. Nor has it found a breach of the duty to bargain by considering simply the reasonableness of the offers and counteroffers made by the parties. This is as it should be. But as Judge Magruder pointed out: "[I]f the Board is not to be blinded by empty talk and by the mere surface motions of collective bargaining, it must take some cognizance of the reasonableness of the positions taken by an employer in the course of bargaining negotiations." N.L.R.B. v. Reed & Prince Mfg. Co., *supra* Note 3, 205 F.2d at 134. The Board could make a comparable judgment in deciding whether its remedial order that reasonable counteroffers be made has been complied with.