**In re The RATH PACKING COMPANY an Iowa Corporation, Debtor.**

**Bankruptcy No. 83–02293.**

United States Bankruptcy Court, N.D. Iowa.

Jan. 12, 1984.

---

Jenner & Block, Chicago, Ill., and R. Fred Dumbaugh, Cedar Rapids, Iowa, for debtor.

Robert E. Funk, Jr., Kansas City, Kan., for Intern. Union.

Harry H. Smith, Sioux City, Iowa, for Local No. 46.

Marc E. Richards and Robert F. Wilson, Cedar Rapids, Iowa, for Employees' Creditor and Equity Committee.

Gary D. Iversen and Barbara Rom, Waterloo, Iowa, for unsecured creditors' committee.

Steven J. Pace, Cedar Rapids, Iowa, for Sec. Pacific Business Credit, Inc.

*Findings of Fact, Conclusions of Law, and ORDERS re Application to Reject Executory Contracts and Related Matters, with Memorandum*

WILLIAM W. THINNES, Bankruptcy Judge.

The matter before the Court is an Application to Reject Executory Contracts, filed by The Rath Packing Company, Debtor-in-Possession (Rath), seeking to reject "certain collective bargaining agreements" between Rath, the United Food & Commercial Workers International Union (the International), and the local unions representing the employees at the various Rath plants.

On November 1, 1983, Rath filed its Petition for Relief under Chapter 11 of Title 11 of the United States Code, and is currently operating as a Debtor-in-Possession. Also on November 1, 1983, Rath filed the Application now before the Court. A hearing on

that Application was scheduled for November 29, 1983, but was continued at the request of the International to allow additional time for discovery and preparation for an evidentiary hearing. Also on November 29, 1983, the Court approved the formation of an Employees' Creditor and Equity Committee (hereinafter "Committee"). The hearing on Rath's Application to Reject Executory Contracts was rescheduled for December 19, 1983, and the Court admonished the parties to proceed diligently with discovery and to continue negotiations toward a settlement of this matter.

On December 19, 1983, both the International and the Committee requested a continuance, citing the need for additional discovery and preparation. The Court denied the International's Motion, finding it had not diligently pursued discovery during the time allotted by the Court. The Committee's Motion was granted, however, and hearing was ordered continued until December 27, 1983. Subsequently, the parties informed the Court that they had forged a compromise that would allow the hearing to proceed on December 20, 1983 (the next day); the Committee and the International withdrew their Motions for a continuance, and the Court approved this agreement. Hearing on Rath's Application was held on December 20, 1983, and continued through December 21 and a portion of December 22. All interested parties were afforded an opportunity to call and examine witnesses, and various exhibits were offered and admitted into evidence. The Court reserved ruling on objections to the admission of certain exhibits, admitting those exhibits subject to the objections interposed. Rulings on those objections are set out *infra*.

Appearing at the hearing beginning on December 20, 1983, were the following attorneys: Michael Rovell, Ronald R. Peterson, and Kenneth Kroot of Jenner & Block and R. Fred Dumbaugh of Dumbaugh, Booth & Chapman, for Rath Packing Company; Robert E. Funk, Jr., for United Food & Commercial Workers International Union; Harry H. Smith of Smith & Smith, for United Food & Commercial Workers Local 46; Marc E. Richards of Booth, Lipton & Lipton and Robert F. Wilson, for Employees' Creditor and Equity Committee; Gary D. Iversen of Mosier, Thomas, Beatty, Dutton, Braun & Staack, and Barbara Rom of Hertzberg, Jacob & Weingarten, P.C., for Unsecured Creditors' Committee; and Thomas Peffer and Steven J. Pace of Shuttleworth & Ingersoll for Security Pacific Business Credit, Inc.

Upon the conclusion of all evidence and after the closing arguments, the Court took this matter under advisement. On December 30, 1983, this Court entered an Order denying in part and granting in part the Application. Now being fully advised, the Court, pursuant to F.R.B.P. 7052, makes the following Findings of Fact, Conclusions of Law, and Orders.

## I. FACTS

The Rath Packing Company began operations in 1891. A packer of meat products, Rath's plants were located, *inter alia,* in Los Angeles, Seattle, San Antonio, Indianapolis, Waterloo (Iowa), and Columbus Junction (Iowa). In the early 1950's Rath had approximately 5400 employees.

In 1976, Rath employees voted to purchase stock in the company with a portion of their weekly earnings. According to a company brochure, this "innovative step was necessary due to the financial losses which threatened the existence of the company." Since that time, the employees have purchased about 49 percent of Rath's common stock through an Employee Stock Option Plan (ESOP). As a result of the ESOP, three employees were elected to Rath's Board of Directors.[1]

The "financial losses which threatened the company" continued during the period 1978 to 1983. Lyle Taylor, Rath's President and Chief Executive Officer, testified to the following profit and loss profile:

---

1. In addition to the 49 percent held through ESOP, about 11 percent of the company's stock has been purchased by the employees individually. In sum, the employees own 60 percent of Rath stocks.

| | |
|---|---|
| 1978 lost | $6,276,000 |
| 1979 lost | 1,407,000 |
| 1980 earned | 2,321,000 |
| 1981 lost | 9,602,000 |
| 1982 lost | 6,492,000 |

According to Taylor, Rath would lose $10,000,000 in 1983. In sum, during the six-year period from 1978 to 1983, Rath netted a loss of $31,456,000.

Approximately 80 percent of Rath's employees are members of labor unions. According to Taylor, "[o]ver the course of ... the last five years, the employees have given up millions of dollars in concessions to the company." These concessions included, for example, a 1978 cessation of incentive pay. This concession was valued at approximately $2,000,000. In 1979, the employees gave up, by way of deferral, a 15 cent per hour wage increase, one-half pay for holidays, one-half pay for vacation, and the first three days of sick leave. These concessions totaled approximately $17,000,000. In 1981 and 1982, the employees' pension plan was terminated. No dollar value was placed on this termination. Taylor's testimony does indicate, however, that the termination absolved the company of a $9,000,000 obligation. In 1982, the employees eschewed $16 per week for capital investment and 30 cents per hour cost of living adjustment. The value of the concession was about $1,000,000. Most recently, in March 1983, the employees agreed to reduce wages, on a temporary basis, from $10.24 per hour to $7.24, with an additional 10 cents per hour going to ESOP and 40 cents to capital expenditure fund. This deferral saved the company an estimated $5,600,000 during 1983.

During this period of concessions, the company's major lender—Security Pacific—became concerned with the continuing loss. In February 1983, a meeting between Rath and Security Pacific was held. The critical discussion at the meeting focused on the company's $20,000,000 line of credit. According to Taylor, the lender was "not satisfied with the progress or the profits of the company ... and suggested that [Rath] ... get some type of crisis management team ... to evaluate the company." The accounting firm of Price Waterhouse was retained, pursuant to a unanimous vote by the Board, to conduct a management study. A final report, termed the "Crisis Management Report" (Report) was produced in April 1983.

The Report, admitted into evidence as Plaintiff Exhibit 9, contains various discussions and recommendations designed to restore profitability.[2] As indicated above, the Report is the result of a study conducted by a "Crisis Management Committee," which was organized after the meeting between Rath and Security Pacific. Concerning the collective bargaining agreement, the Report stated that the Committee took the view that "for ... purposes of [the] study ..., there should be no constraints on ideas or programs due to past or present conflicts with the master labor agreement."

The Report also made the observation that "Rath ..., as it is *currently* operated and experiencing substantial losses, is *not* a viable long-term competitor in the meatpacking industry." Further, the Report stated that the "company has been primarily concerned with retaining a strategic status quo, presumably to preserve jobs and avoid further labor/management confrontations." Concerning plant operations, the Report observed that Rath "is ... heavily burdened by restrictive work rules in many plants." Referring specifically to Rath's health care plan for the employees,[3] the Report observed:

The plans provide comprehensive medical, dental, vision care, and prescription drug benefits. The plans are generally characterized by first dollar coverage, minimal coinsurance and deductibles, and few em-

---

2. Among the recommendations were ones directed to changes on the management level. According to Taylor, approximately half of these recommendations have been partially implemented and an additional one-quarter have been fully implemented.

3. Greg Kohn, Rath's insurance and benefits manager, testified Rath's health care plan is known in the meat packing industry as a "Cadillac-type program."

ployee contributions (even for dependent coverage). This "first dollar" structure increases plan costs because all or almost all employees are likely to incur covered expenses each year. It is also ineffective as risk insurance because it reimburses employees for items that the employee can afford without substantial financial hardship. In addition, the plans contain few, if any, incentives for employees to choose less expensive forms of health care, such as outpatient surgery.

\*     \*     \*     \*     \*     \*

At the same time, the plans do not provide the unlimited coverage that is essential for such catastrophes as brain or spinal injury, amputations, or birth defects. As a result, the plans do not provide adequate insurance against those risks that no employee or retiree can afford to bear. This is a serious defect, especially because the cost of catastrophic protection is low.

*Health care costs can be cut while producing better health insurance*

The cost of Rath's medical benefits program can be reduced significantly while at the same time providing employees and retirees with the catastrophic coverage that they now lack.

The Report then recommended various changes, including the creation of comprehensive medical plan with deductibles, implementation of employee contributions and increasing employee co-payments under the prescription drug card plan, elimination of vision care and medical B reimbursement, and subrogation of Rath's liability to that of other insurers.

Turning to the "inconsistent levels of production ... in the plant," the Report identified several factors that contributed to the inconsistency. One such factor is the seniority system, which the Report described as follows:

[W]hen one operation is shut down or cut back, senior people from that operation can displace less senior people in another unrelated operation. Thus, it's possible for a very experienced beef break butcher to end up packaging 1 lb. cards of sliced bacon. *This is clearly ineffective and very inefficient.* (Emphasis added).

The Report also recommended changes in Rath's maintenance management procedure. Specifically, the Report recommended modification of "current procedures ... to include the ability to assign staff to perform maintenance as efficiently as possible." This recommendation would eliminate inefficiency mandated under current work rules:

For example, under present procedures it is possible to have as many as six maintenance men on one assignment. For example, this occurs in a situation where a pump and motor for a Cry-o-Vac shrink tunnel needs repair. Electricians must disconnect the motor, millwrights would remove the pump and pipefitters would unhook the piping and in each case it is frequently normal to have a lead man and an assistant or apprentice with each craft, thus a total of six. Adding to the efficiency considerations is the factor that two crafts may be at the job site, but are waiting for a third craft before they can do their work. This type of change would, of course, require discussions with the union and obtaining its approval for the revised method of operating the department.

Given the observations in the Report, the consultants noted that "[i]t is not necessary for production workers to take further wage and benefit concessions. *It is necessary for many of the restrictive work rules provisions and costly guarantees built into the labor contract to be eliminated.*" (Emphasis added).

Supplementing the Report's findings, Taylor testified to an intricate and bewildering process by which an absent employee may be replaced. This process, referred to as "bumping," is illustrated by the following testimony:

This shows a Mr. DeWolf going on a leave of absence. Mr. DeWolf was pushing hogs. The man that replaced him is Mr. Klar and Mr. Klar come from pulling loins. Mr. Schares went to replace Mr. Klar. Mr. Schares came from hooking

loins. Mr. Mangrich went to hook loins and Mr. Mangrich was on let out. This gentleman was—Let's see, he went to let out. He came from trimming butt. Mr. Kloberdanz went to trimming butt. Mr. Kloberdanz came from trimming, and Mr. Miller replaced Mr. Kloberdanz on trimming and he was a return from sick leave.

Rath's plant manager in Waterloo, Leroy Grittman, testified that the example quoted above was an actual occurrence. Moreover, Grittman indicated that during the week of December 12, 1983, there were 458 "bumps." According to Taylor, such "bumping" incidents—mandated by the seniority system provisions in the labor agreements—cause ten- to fifteen-minute delays.

Taylor also testified that the grievance procedure pay provisions in the agreement are "burdensome." According to the agreement, the company "pay[s] for investigation and grievance time on all first and second step grievances." This multi-step procedure was described by Taylor as follows:

Well, first of all an individual would have to feel that his rights or something had been violated and he would then ask the foreman for an investigation to get a steward. A steward would be taken off the job as well as that individual. They would go out and discuss whether or not there had been a violation of the contract.

If they felt there was a violation then at that point they would call a foreman into the grievance procedure, they present their case, he would render an answer, or they may recess the grievance and call the division steward down and confer with him about their grievance.

And then if they decided that the foreman's answer was not satisfactory they would ask for another procedure, which is the second step, in which the division superintendent would come down with the division steward, the department steward and the employee or employees on that grievance, and they would then again go through the grievance.

If no reasonable solution was reached then it would go to the third step, which involves the local union bargaining committee, the company labor relations team and the witnesses would present their case there again. If that procedure was not satisfactory there is a prearbitration hearing which an international representative can be brought in, and if that is unsuccessful, then the arbitration procedure is available to the union.

Similarly, Taylor also opined that the work rules concerning clothes changing are "burdensome." Explaining his opinion, Taylor indicated that

That is burdensome because when it was originally put in, and that's been in the contract for years, it was put in in effect where the company required a clothes change. *Now the majority of jobs do not require a clothes change* and in most cases employees wear the same clothes in and out that they work in all day. (Emphasis added).

In sum, Taylor emphatically asserted that if the contract containing these work rules were not rejected, Rath could not secure financing, the consequence of which is failure to reorganize. Further, Taylor indicated that if the company failed to reorganize, the employees would lose their jobs, and "[i]t's very doubtful that there would be anything left for the unsecured creditors."

Another significant feature of the union contract is the provision that on January 1, 1984, the workers' pay would rise to $10.24 per hour from the current level of $7.24 per hour. The increase would cost the company between $6,000,000 and $7,000,000. Even ignoring the burdensome work rules mentioned above, such an increase in pay would, according to the expert testimony of Mr. Richard Bertholdt, cause Rath to run out of cash in ninety days.

Testifying for the International, Lewie Anderson—the International's vice president—agreed with the observation that at $10.24 per hour, Rath would not survive. At various times during his testimony, Anderson claimed that the International had offered to forego the increase to $10.24 and instead agree to a rate of $8.00 per hour.

This "offer," however, must be examined in the context of the International's refusal to agree to modifications of selective provisions in the contract. Rather, the International would only agree to a "package deal" —one provision of which is the $8.00 per hour pay rate. The Union's concessions in this "package" included $231,000 in starting pay, $220,000 in rest period, $43,538 in night premiums, $50,700 in clothes allowance, $509,700 clothes changing time, $420,000 in sick pay benefits, $1,005,000 in medical/HMS, $100,000 outpatient, $20,000 in vision care, $51,000 prescription drug, $21,000 dental, $162,806 in incentive pay. The total savings to Rath from this package is approximately $3,000,000. In exchange for the $3,000,000 concession, the Union demanded a raise in pay from $7.24 to $8.00 per hour. The total cost to Rath at this rate of increase would be $1,824,000 per year. Additionally, Rath would make concessions of $264,000 in holidays, $197,801 in vacation, and $120,000 in ESOP. The net effect of the Union's concessions is that Rath would realize only a net savings of less than $900,000.[4]

During the trial, Rath introduced through Grittman a chart comparing selective provisions of labor agreements at Rath and some of its competitors, viz., Madison Foods, Swift, FDL, Iowa Pork, and Wilson. The chart was admitted into evidence as Plaintiff Exhibit 39. A review of the Exhibit reveals that among the six packers, only Rath pays for grievance time. Similarly, only Rath pays for special lay off. Likewise, only Rath has the A–B–C male-female seniority system. Taylor described this system as follows:

A is primarily male jobs, B is primarily female jobs. C is jobs which can be performed by either sex. And when an individual—When, for instance, a male is faced with a B job, he has a right to decline that job and remove the youngest female who would be on a C job, providing his seniority is older than him to avoid layoff. Then within that system we make our general plant reduction.

First of all during the week we decide—about on Wednesday we do our manning and decide if we want 1450 people and we have 1500, we at that point decide there's going to be a reduction of 50 people because of some slowdown in production or some reduction of a line. We then go to the plant, reduce the youngest 50 people out for layoff on paper. Then we reduce the departments back that we were going to reduce. Those people have a right in some case, if they're on a plan assignment or a transfer assignment, they have an option of going back to their previous department. If they have no options then they go down, there's a list posted in the plant in which all the openings are posted. Anyone in the plant can come down and make—request transfer for any of those openings.

By the same token, only Rath provides non-safety apparel in the form of 50 cent and 25 cent weekly allowance to other jobs. Last, only Rath has a minimum divisor vacation scheduling.

In addition to Grittman's comparison of selective work rules, Anderson testified to the wage rate at Rath and other meat packers. For example, at John Morrell, the rate is $8.25 per hour; at Oscar Mayer, $8.25 per hour; at FDL, $7.50 per hour; at Swift Independent, $8.25 per hour. The wages at these competitors would increase by 50 cents sometime in 1985. At Rath, however, the rate is $7.24 per hour with an increase to $10.24 per hour on January 1, 1984.

As indicated earlier, Mr. Richard Bertholdt, an accountant who specializes in the meat packing industry, testified via deposition that $10.24 per hour "would cause the company to experience lack of viability in

4. The Union did not agree with the $900,000 figure. Instead, it maintains that an additional $6 or $7 million—which is the amount claimed by the International in a dispute pending before the National Labor Relations Board, see n. 5 infra—should also be considered as a concession. This is so because the International offered to withdraw this NLRB claim during the negotiations between the parties.

90 days." Referring to the work rules in the collective bargaining agreement, Bertholdt opined "that the company cannot survive with the present collective bargaining agreement." Moreover, Bertholdt indicated that Rath could not survive even "if all of the recommendations in [the] Report were adopted and implemented except for those ... that require a modification or termination of the collective bargaining agreement." On the other hand, Bertholdt opined that "the rejection of the collective bargaining agreement would materially advance the reorganization of" Rath. Last, referring to the lenders, Bertholdt indicated that they would not consider lending if the current collective bargaining agreement is left in place.

According to Plaintiff Exhibit 12, Bertholdt began his accounting career in 1956. At the time of his deposition, Bertholdt was the partner in charge of Price Waterhouse's Chicago office. His experience included engagements for numerous multinational clients in the food industry, auditing and acquisitions, and publication of two books and numerous articles. From 1968 to 1978, he was Price Waterhouse's leading food specialist. Such credentials verify that Bertholdt is an eminent expert in this field, and the Court finds that considerable weight should be accorded his opinions. Additionally this Court notes that the International offered no expert testimony to contradict Bertholdt's opinions and conclusions.

Turning to the negotiation sessions between the parties, the International offered the testimony of Alvin Vincent, its chief negotiator. Vincent testified to the concessions offered by the International, all of which have been mentioned above. During his testimony, Vincent alleged that on numerous occasions Taylor asserted that the parties should "let the judge decide" the issues in question. In addition, Vincent conceded on cross examination that during the negotiations, the International conveyed to the company overtures of a strike or boycott if the company fails to accept the International proposal. Moreover, Anderson, Vincent's supervisor, testified that the International would not allow the Local Union to vote on Rath's proposal. Indeed, by invoking Article 23 of the Union Constitution, it appears that no agreement between management and labor can be reached without approval by the International. In other words, the negotiations between management and labor appear to be controlled by the International, not the Local. To this end, this Court notes that it was the Local, not the International, that agreed to keep the hourly rate at $7.24 until January 1, 1984. Moreover, this Court is mindful that the Local Union approved to reopen negotiations with the company. Apparently the International, as was the case with the Local's March 1983 vote to defer wages,[5] was not involved in the process of reopening negotiations.

Against the backdrop of the events described above, by a unanimous vote of its Board of Directors, Rath filed a Chapter 11 Petition in this Court on November 1, 1983. At the time of filing, all but the Waterloo and San Antonio plants were closed. Only about 2,000 employees were on the payroll. In addition to several administrative applications, the instant Application was filed. Albeit an unpleasant task, this Court must now decide whether the Application should be granted.

## II. INDIANAPOLIS PLANT

In its Application to Reject Executory Contract filed on November 1, 1983, Rath asserted that one of its plants was located in Indianapolis, Indiana. The Application also stated that most of Rath's employees were employed under collective bargaining agreements with the International. These agreements were attached to the Application and marked as Exhibit A. One of those agreements is between Rath and the Indianapolis union.

When hearing commenced in this matter, the Court was alerted to the fact that no

---

5. The International, as a result of the local's approval of the deferral, has filed an unfair labor practice claim against Rath before the National Labor Relations Board in the amount of approximately $7 million. The merits of this claim have, however, not been resolved.

attorney of record has appeared for the Indianapolis union. A question of adequate notice is therefore raised with respect to the Indianapolis union.

█ Federal Rule of Bankruptcy Procedure 6006(c) provides that "[w]hen a motion is made [to reject an executory contract], the court shall set a hearing on *notice to the other party* to the contract." The Advisory Committee Note accompanying Rule 6006(c) states that "[t]he other party to the contract should be given appropriate notice of the hearing." A review of the Certificate of Service filed by one of Rath's attorneys on November 1, 1983, reveals that the Indianapolis union was not served with the Application to Reject Executory Contract.[6] In light of the requirement of F.R.B.P. 6006(c) and the absence of notice, an appropriate order will be entered to provide adequate notice to the Indianapolis union.

## III. EVIDENTIARY DETERMINATIONS

During the hearing, the Court reserved ruling on several evidentiary objections. Having reviewed and considered the entire record, the Court now makes the following final rulings with respect to the objections raised.

### A. *Defendant Exhibit S*

The International sought admission of a "Memorandum of Agreement," marked for identification as Defendant Exhibit S. The Exhibit purports to summarize the International's most recent proposal. The "Memorandum" is not signed by either party, and appears to be a unilateral listing of the International demands and concessions. Among the demands and concessions are provisions concerning the pay structure and various fringe benefits.

Rath objected to the admission of Exhibit S. Specifically, its objection is two-pronged: (i) the Debtor-in-Possession has never been shown the document before trial and (ii) the Exhibit contains a self-serving written memorialization of the International's demands and concessions previously testified to by live witnesses. Translated into evidentiary terms, Rath's objection seems to involve Fed.R.Evid. 403 and 1006.[7]

There appears to be little dispute that Exhibit S is relevant to show the negotiation postures of the parties. *See generally* Fed.R.Evid. 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ... or needless presentation of cumulative evidence." Fed.R. Evid. 403.

█ Exhibit S has little probative value. The International's negotiator testified in detail to the International's demands and concessions. The negotiator's testimony, not Exhibit S, is most probative of the International's negotiation posture. *See generally Vanskike v. ACF Industries, Inc.*, 665 F.2d 188, 200 (8th Cir.1981) (proffered evidence bore "[n]o additional probative value"; not admissible). Stated otherwise, Exhibit S offers nothing new and if admitted would merely be cumulative. The low probative value of Exhibit S is therefore substantially outweighed by the needless presentation of cumulative evidence. *See generally E.I. du Pont de Nemours & Co. v. Berkley & Co.*, 620 F.2d 1247, 1272–73 & n. 48 (8th Cir.1980) (exhibit characterized as "waste of time;" not admitted). It should be excluded.

### B. *Plaintiff Exhibit 19*

Rath sought admission of Plaintiff Exhibit 19, draft of the collective bargaining agreement between Iowa Pork Industries,

---

6. The Indianapolis union was served by Rath's attorney on November 14, 1983, with a "Notice of Hearing." The Notice indicated that a hearing on the Application to Reject Executory Contract would be held on November 29, 1983. No one appeared on behalf of the Indianapolis union on November 29, 1983. To avoid any

collateral challenge by the Indianapolis union, this Court will assume that failure to serve the Indianapolis union on November 1, 1983, was not cured by the November 14, 1983, notice.

7. "The Federal Rules of Evidence ... apply in cases under the Code." F.R.B.P. 9017.

Inc., and its labor union. The International objected to the admission of the Exhibit on the ground of relevancy. The objection should be overruled.

■ Under the applicable legal standards, the provisions of collective bargaining agreements of Rath's competitors may aid the Court in evaluating some issues of the instant case. *See infra*. Rath's Waterloo plant manager testified that Iowa Pork Industries, Inc., is one of the Debtor-in-Possession's competitors. The collective bargaining agreement between Iowa Pork Industries, Inc., and its labor union therefore "make[s] the existence of [a] fact that is of consequence to the determination of the action more probable ... than it would be without the evidence." Fed.R.Evid. 401. The International's objection should be overruled and Plaintiff Exhibit 19 should therefore be admitted. *See generally McGowne v. Challenge-Cook Brothers, Inc.*, 672 F.2d 652, 665 (8th Cir.1982).

### C. *Plaintiff Exhibit 4*

Plaintiff Exhibit 4 is the collective bargaining agreement between Rath and the Indianapolis plant (Local 167). When the Debtor-in-Possession sought to introduce Plaintiff Exhibit 4, the Court was alerted to the apparent lack of service of notice on the Indianapolis union. In light of the disposition of this question in Division II *supra*, Plaintiff Exhibit 4 is irrelevant. The Exhibit should therefore be excluded at this time, without prejudice to it being introduced at a later hearing. The objection lodged by the International to Plaintiff Exhibit 4 is therefore sustained.

### IV. APPLICABILITY OF SECTION 365

The authority for a debtor-in-possession to assume or reject an executory contract is found at 11 U.S.C. § 365(a). Under any ordinary construction of the term "executory contract," *see e.g.*, BLACK'S LAW DICTIONARY 512 (5th ed. 1979); H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 58 (1978),

U.S.Code Cong. & Admin.News, p. 5787, it appears that collective bargaining agreements are executory contracts and thus subject to assumption or rejection pursuant to § 365. Although litigants may urge a court to exclude collective bargaining agreements from the effect of § 365, the major decisions in this area have uniformly held that collective bargaining agreements are subject to the terms of § 365.[8] *Shopmen's Loc. U. No. 455, et al. v. Kevin Steel Prod., Inc.*, 519 F.2d 698, 701–06 (2d Cir. 1975); *Truck Drivers Local U. No. 807 v. Bohack Corp.*, 541 F.2d 312, 320 (2d Cir. 1976); *Local Joint Executive Bd. et al. v. Hotel Circle*, 613 F.2d 210, 213 (9th Cir.1980) (All three cases construing § 313(1) of the old Act, the predecessor of § 365); *In re Bildisco*, 682 F.2d 72, 78 (3rd Cir.1982), *cert. granted*, —— U.S. ——, 103 S.Ct. 784, 74 L.Ed.2d 992 (1983), *In re Brada Miller Freight System, Inc.*, 702 F.2d 890, 896–97 (11th Cir.1983). In particular, the analysis of the *Brada Miller* court is especially thorough and well-reasoned. There is nothing of substance that should be added to that treatment of the issue.

### V. APPLICABLE TEST

If it can be said that the courts have spoken with one voice on the issue of § 365 applicability to collective bargaining agreements, it might also be said that the curse of Babel struck when the courts came to consider the test for allowing rejection of collective bargaining agreements. *See Genesis* 11:1–9. The only truly common ground shared by the major decisions is that rejection of collective bargaining agreements requires closer scrutiny than does rejection of "ordinary commercial contracts." *See, e.g., Kevin Steel*, 519 F.2d at 707; *Bohack*, 541 F.2d at 320; *Hotel Circle*, 613 F.2d at 214; *Bildisco*, 682 F.2d at 79; *Brada Miller*, 702 F.2d at 897–98. This Court has previously stated its reluctance to accept the rationale for this heightened scrutiny. *In re Concrete Pipe Machinery Co.*, 28 B.R. 837, 840 (Bkrtcy.N.D. Iowa 1983).

---

**8.** One exception exists, however. 11 U.S.C. § 1167 specifically excludes from the effect of § 365 those collective bargaining agreements which are subject to the Railway Labor Act (45 U.S.C. § 151 et seq.)

Two commentators, unconvinced that any test announced to date provides adequate protection for collective bargaining agreements, advocate an even more stringent test:

> At the very minimum, no bankruptcy court should authorize the rejection of a collective bargaining agreement until the debtor establishes that it bargained in good faith with the union with respect to modifications in the collective bargaining agreement deemed necessary by the debtor for continuation of the business enterprise, and that the union refused to agree to these modifications. The court should also place a very heavy burden of justifying rejection on the debtor, given that the debtor is seeking to accomplish an act expressly forbidden by the NLRA. Moreover, the court should insure that the union is given a full opportunity to analyze the arguments and financial data submitted by the debtor or relevant to the issue, so that the union will be in a position to argue cogently that the modifications sought by the debtor are not in fact necessary to a successful reorganization, if such an argument can be made. The court should also satisfy itself that the debtor is not primarily motivated by a desire to eliminate the union. Finally, the court should not approve rejection if it appears that the debtor might reorganize successfully without rejection. (Footnotes omitted).

Bordewieck & Countryman, "The Rejection of Collective Bargaining Agreements by Chapter 11 Debtors." 57 *Am.Bankr.L.J.* 293, 317 (Fall 1983). Bordewieck & Countryman treat this subject in a very thorough and scholarly manner, and eloquently argue for special protection of collective bargaining agreements.

Another commentator recently offered a similarly thorough treatment of this issue, but arrived at a much different result. Pulliam, "The Rejection of Collective Bargaining Agreements Under Section 365 of the Bankruptcy Code" 58 Am.Bankr.L.J. 1, (Winter 1984). Pulliam argues that the legislative enactments embodied in the Bankruptcy Code are sufficiently clear to indi-cate that Congress did not intend special treatment for collective bargaining agreements under § 365. To do so, he opines, would be an unwarranted judicial intrusion upon congressional prerogative.

This Court finds Pulliam's reasoning on that issue very persuasive. Ever since Mr. Chief Justice Marshall announced the landmark decision of *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), courts have been very sensitive to the constitutionally mandated limits of their authority. While the *Kevin Steel—Bildisco—Brada Miller* test is appealing as a means of accommodating the apparent conflict between the Bankruptcy Code and the NLRA, the legal reasoning supporting the use of that test is not convincing. As stated in Pulliam:

> Courts often begin their analysis with the language of section 365(a) but seldom conclude there. In fact, courts that employ the prevailing *Kevin Steel* standard or some variant thereof end up a great distance from the statute. The plain language of section 365(a) leaves little room for consideration of conflicting policies and implied restrictions: "[T]he trustee, subject to the court's approval, may assume or reject *any* executory contract ... of the debtor." In the face of this language, the "power" to reject and "standard" for rejection are identical issues. If a collective bargaining agreement constitutes "any executory contract," and is therefore subject to rejection, there is no legitimate basis for holding a labor agreement to a more stringent standard for rejection. Courts may like to balance, and in some contexts are forced to balance—when, for instance, the relevant statute calls for balancing or there is a genuine statutory or doctrinal conflict to be resolved. With section 365(a), however, one must presume that Congress did all the balancing it wished to be done when it enacted the broad and literally absolute language of the statute.

58 Am.Bankr.L.J. at 37–38 (footnotes omitted).

Obviously, "reasonable minds" have differed with regard to the congressional intent underlying 11 U.S.C. § 365. Guidance on that issue may be forthcoming from the Supreme Court in the *Bildisco* decision. Until then, courts should, to the extent possible, analyze the facts of a case in light of each of the major tests. The facts of this case are such that, regardless of which test is applied, the same result obtains. Therefore, this Court need not choose from among the various tests or promulgate its own version. Indeed, it could prove an exercise in futility to engage in an extensive analysis of what is the appropriate standard. Nevertheless, it is necessary to comment briefly on one of the theoretical concepts advanced in support of the various tests.

The "new entity" concept, espoused by the court in *Kevin Steel* and followed by *Brotherhood of Railway, et al. v. REA Express, Inc.,* 523 F.2d 164 (2d Cir.1975), and *Bildisco* to avoid conflict with the NLRA by treating a debtor-in-possession as a new entity and not a party to the prepetition contract, is a metaphysical nightmare. As stated in Pulliam, *supra,* at 25:

> The Court retracted a good deal of its new entity rhetoric, however, because the successorship argument obviously proved too much; if the debtor was a "new entity," why did it have to reject a contract to which it was not a party, and why should *any* restrictions be placed on rejection? The *Bohack* court explained: "Of course, the statement that the debtor is not a 'party,' and the analogy to the successor employer, cannot be taken literally, since neither affirmance nor rejection of the collective bargaining agreement would be possible by one not a party to it." Where does this leave *Kevin Steel* and *REA Express,* if the successorship analogy is not to be taken "literally" (did the court mean "seriously")?

Turning to the tests that have been applied by various courts, they are essentially of two types. First, there is the so-called "Business Judgment Test," which requires the debtor-in-possession to show that rejection of the contract would substantially aid the reorganization process. In other words, prudent business judgment dictates the result. *See e.g., Bildisco,* 682 F.2d at 79; *Concrete Pipe,* 28 B.R. at 840. The second type involves variations on a theme of heightened scrutiny. This heightened scrutiny requires a court to look beyond mere business considerations and engage in some balancing of the supposedly competing policies of the National Labor Relations Act and the Bankruptcy Code. The specifics of each test will be considered in detail in Div. VI, *infra.*

## VI. APPLICATION OF FACTS TO EACH TEST

### A. *Business Judgment Test*

The "usual" test for rejection of an executory contract is whether the rejection benefits the bankruptcy estate. *See* 2 Collier on Bankruptcy, ¶ 365.03 at 365–18 (15th ed. 1981). *See also Group of Inst. Investors v. Chicago, M.St.P. & P.R.Co.,* 318 U.S. 523, 550, 63 S.Ct. 727, 742, 87 L.Ed. 959 (1943) (question of whether lease should be rejected or assumed is one of business judgment). Rath easily meets the requirements for rejection under this test.

The Crisis Management Report recommended two key changes that were affected by the collective bargaining agreement: work rules and health benefits. Additionally, potential lenders have avoided commitments to Rath until concessions are given by the union or the collective bargaining agreement is rejected. Rath has attempted to get the needed concessions through numerous bargaining sessions. No agreement was reached. When the parties have bargained in good faith, the court will not attempt to assess any "blame" for failure to agree to any specific proposal or counterproposal. The simple fact is, Rath has a collective bargaining agreement with the International and the various locals that contains inefficient work rules and costly, ineffective, health benefits. The most dramatic factor, however, is the wage rate. As the contract now stands, the wage rate is $10.24 an hour. The employees are currently receiving $7.24 an hour pursuant to a

negotiated deferral. That Agreement expires December 31, 1983, and the $10.24 an hour rate will become effective again. The consensus is that Rath could not survive at such a wage rate. Prudent business judgment, therefore, dictates rejection of the collective bargaining agreement.

## B. *Heightened Scrutiny*

Beginning in *Kevin Steel,* most courts which have given "special attention" to rejection of collective bargaining agreements have employed either an implied or an explicit two-step analysis. The First Step requires a showing that the collective bargaining agreement is "onerous and burdensome" to the estate. If that threshold requirement is met, the second step requires some degree of "balancing" the equities for and against rejection.

### 1. *Onerous and Burdensome*

The courts which have promulgated various tests that include an onerous and burdensome requirement have shown a frustrating tendency to avoid any discussion of what constitutes an onerous or burdensome contract. It seems certain, however, that a contract must be more than simply unfavorable from a business judgment viewpoint to constitute an onerous or burdensome contract for purposes of the aforementioned tests. This Court is convinced that Rath's collective bargaining agreement is onerous and burdensome upon the business operations of the Company.

There are a number of specific provisions in the Rath collective bargaining agreement that are either absent or less restrictive in the collective bargaining agreements of Rath's competitors. These provisions, extracted from Plaintiff Exhibit 39 and other testimony, may be tabulated as follows:

| Rath | Other Competitors |
|---|---|
| A–B–C male-female seniority system | NO |
| Non-safety apparel | NO |
| Minimum divisor vacation scheduling | NO |
| Grievance procedure pay | NO |

| Rath | Other Competitors |
|---|---|
| Special layoff | NO |
| Voluntary layoff | 3 of 5 competitors NO |
| Pay for Union Officials | 3 of 5 competitors NO |
| Overtime penalties | 3 of 5 competitors NO |
| 3-year seniority retention on layoff | 1½ to 2 years |
| Beginning 1/1/84, $10.24 per hour | Beginning 1/1/84, $8.25 per hour |

In summary, in five categories Rath provides benefits that no other competitor provides. In four categories, Rath provides benefits that most other competitors (three of five) do not provide. In the wage category, Rath pays $2.00 per hour higher than any competitor. In no other category is Rath's work rules or benefits inferior (with respect to the employees) to the other competitors.

The Court does not hold that each provision by itself is *per se* burdensome. Rather, an examination of all categories convinces the Court that the identified provisions in the collective bargaining agreement are onerous and burdensome when compared to those in the agreements at Rath's competitors.

In addition to the objective comparison set forth above, the Court is persuaded that other provisions to which no comparison was made are onerous and burdensome to an effective operation of a meat packing plant. The testimony relating to "bumping," for example, reflects an antiquated system that petrifies sound businesslike development. Similarly, the clothes changing provision is outdated and no longer serves any useful function. Likewise, as suggested by the Report, the Cadillac-type health care system should be revamped so that "health care costs can be cut while producing better health insurance."

In sum, from an objective comparison with its competitors, Rath's collective bargaining agreement contains provisions that are restrictive. From a normative, subjective point of view, the Rath agreement is outdated and of low functional utility. If left in place, the agreement is onerous and burdensome to the estate.

## 2. Balancing Equities

The courts, when constructing the various tests governing rejection of collective bargaining agreements, have prescribed numerous factors that should be considered when "balancing the equities" for and against rejection. For example, *Kevin Steel* (citing *In re Overseas National Airways,* 238 F.Supp. 359 (E.D.N.Y.1965)) recognized that rejection may deprive employees of seniority, welfare, and pension rights as well as other benefits that would not provide the basis for a provable claim.[9] *Bildisco* provided a somewhat more detailed list:

> In the multiplicity of fact situations that will arise, we think our best option is to require the bankruptcy courts to undertake a "thorough scrutiny, and a careful balancing of the equities on both sides" as set forth in *Kevin Steel.* Each case will present its own complexities. For example, the bankruptcy court must understand that the debtor-in-possession who rejects a collective bargaining agreement remains an employer and is still required by the NLRA to bargain with the representatives of its employees, *Kevin Steel,* 519 F.2d at 704, and that its employees retain their right to strike should negotiations fail, *see In re Ryan Co.,* 83 Lab.Cas. (CCH) ¶ 10,487 at 17,952 n. 2 (D.Conn.1978). The consequences of a strike on a precarious business therefore must be one factor to be weighed by the bankruptcy court. Moreover, because under § 365(g) rejection constitutes a breach of contract, the employees may assert a claim for the value of the benefits lost. The court should consider both the impact of the resulting claim against the debtor and the adequacy of the relief employees might obtain through the claims procedures.

682 F.2d at 80. (Footnote omitted).

*Brada Miller,* however, articulated more completely the relevant factors:

[N]o hard-and-fast test may be applied in every case. There are, however, a number of factors which we think might properly be considered by a bankruptcy court addressing a motion to reject;

\*　　\*　　\*　　\*　　\*　　.　\*

First, of course, is the possibility of liquidation, both with and without the rejection, and the impact of liquidation on each of the parties involved.... In calculating the probability of liquidation after the rejection of a collective bargaining agreement, the bankruptcy court should bear in mind that a debtor-in-possession, even after rejection, is compelled to bargain with an established bargaining unit in an attempt to execute a new collective bargaining agreement; therefore, the impact of a potential strike on the debtor need also enter into the court's calculus.

Second, (and closely related to the first), a court should consider the claims that will result from the rejection of a collective bargaining agreement, both in terms of the adequacy of relief for the employees and other claimants, and the impact of these claims on the debtor. This factor is especially important since many of the benefits received by employees under collective bargaining agreements are nonmonetary and generally incapable of providing a basis for a damage award.

\*　　\*　　\*　　\*　　.　\*　　\*

Third, the cost-spreading abilities of the parties must be considered in a resolution based on the equities.... The consideration of this factor seems especially appropriate since it was the discrepancy in economic power between labor and management that provided the impetus behind the establishment of the labor law policies we now seek to preserve.

Finally, the good (or bad) faith of the unions and the debtor in seeking to re-

---

**9.** This may no longer be a serious problem because the new code provides that all claims must be estimated. 11 U.S.C. § 502. There may be certain intangible benefits, however, which elude all attempts at estimation.

solve their mutual dilemma might be examined by the bankruptcy court. For example, did the employer seek concessions from the unions prior to its attempt to reject the contract? If so, how cooperative was the union? The tone of past negotiations between the parties is also relevant in evaluating their behavior. We stop short of requiring that the parties commence the bargaining process prior to the granting of a motion to reject, but we leave it to the discretion of the bankruptcy court to require such bargaining after considering the likelihood of success, the potential length of the negotiations, and the impact of delay on the debtor-employer.

702 F.2d at 899–900. (Footnotes omitted).

Eight distinct yet interrelated factors may be isolated from the foregoing examples: (1) the rights and benefits the employees might lose upon rejection, (2) the claims for breach of contract arising from rejection, (3) duty of debtor-in-possession to continue to bargain collectively after rejection, (4) the employees retain the right to strike, (5) the effects that a strike might have, (6) the possibility of liquidation both with and without rejection, (7) the cost-spreading abilities of the parties, and (8) the good or bad faith of the union and the debtor-in-possession in seeking to resolve the crisis.

This Court has considered each of these factors in light of the facts of this case, and is convinced that the equities strongly favor rejection. Indeed, it appears that rejection will, in the final analysis, benefit both Rath and its employees.

There are three major areas in which Rath's employees would be affected by rejection of the collective bargaining agreement. The wage rate of $10.24 per hour, contained in the agreement, would be lost. Rath has firmly stated that if the agreement is rejected it intends to keep the wage rate at the current level of $7.24 per hour. Another major change would be made in the work rules, such as those affecting em-

ployee seniority provisions. Rath has indicated that it will implement some seniority system that allows more management flexibility and that avoids the egregious inefficiencies such as those described at trial and in the Crisis Management Report. The third major area of change would be in the health plan and similar benefits. The Crisis Management Report cited a number of potential changes that would produce significant savings for Rath while actually improving the overall health benefits package. Finally, the Court notes that pension rights would not be affected by rejection of the collective bargaining agreement because Rath terminated its pension plan in 1982. There are surely other rights or benefits that the employees would lose if the collective bargaining agreement is rejected. Some are, no doubt, intangibles which defy quantification. For that reason, those factors are difficult to weigh during the balancing process, and thus must serve a very subjective, albeit important, role in the court's balancing of the equities.

The record contains very little with regard to the size and nature of a claim for breach of contract arising from rejection of the collective bargaining agreement. The only testimony in that regard is Lyle Taylor's statement that the claim would be enough to bankrupt the company unless it could be reduced under a Plan of Reorganization. In any event, the Court must give consideration to this claim, especially in the context of the possibilities of liquidation both with and without rejection.

The Court is also mindful that the employees retain the right to strike and of the effect a strike might have on Rath. This is a very unusual case, however, because the Rath employees own 60 percent of the company. A strike would, therefore, be economic pressure by the employees against their own assets.[10]

The possibility that Rath will be forced to liquidate is a pervasive factor in this case. There is little dispute that a successful reor-

---

10. With all due respect and credit to the late Walt Kelly, this Court is reminded of the immortal words of Pogo: "We have met the enemy and it is us."

ganization would benefit all parties concerned. What the Court must weigh is the possibility of liquidation if the agreement is not rejected, and the likelihood that liquidation might occur even if the agreement is rejected. Rath presented credible expert testimony that the company would not survive 90 days if a wage rate of $10.24 per hour were paid to the employees. Additionally, the Crisis Management Report opined that Rath was not, under current conditions, a viable entity in the meat packing business in the long-term. Further, Rath offered expert opinion that it could return to profitability if the recommendations of the Crisis Management Report—changes in both management and labor—were fully implemented. Lyle Taylor testified that approximately 25 percent of the recommended changes in management have already been fully implemented, while an additional 50 percent have been partially implemented. No changes have been made with regard to labor, however, because those changes require modification of the collective bargaining agreement. The International did not offer any evidence to dispute Rath's claims regarding liquidation or return to profitability. The International did, however, introduce evidence to show that Rath has an alternative to rejection of the agreement. The testimony of Mr. Anderson and Mr. Vincent was offered to show that the union had agreed to make the concessions Rath needed to effect the necessary labor changes. Close inspection of those concessions reveals that they were not unconditional. Mr. Taylor testified that Rath could not accept the concessions upon the conditions proposed by the union. The Court is not prepared to hold that such a decision was reasonable or unreasonable. All that is required in collective bargaining is good faith negotiations. *National Labor Relations Bd. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 L.Ed. 893 (1937); *National Labor Relations Bd. v. American Nat. Ins. Co.*, 343 U.S. 395, 402, 72 S.Ct. 824, 828, 96 L.Ed. 1027 (1952). In any event, no agreement was made and Rath cannot now make the recommended labor changes unless the collective bargaining agreement is rejected. Other evidence bearing on this issue shows that some potential lenders have refused to loan money to Rath with the current collective bargaining agreement intact. The record is silent as to whether any other lenders would require the collective bargaining agreement to be modified or rejected as a prerequisite for a loan.

The factor of the cost-spreading abilities of the parties is a difficult one to weigh. First, the court must determine which parties are subject to this analysis. To some extent, all interested parties are affected by rejection of an executory contract. In the present case, however, it seems that only the company and the employees will be significantly affected by rejection of the collective bargaining agreement. Even in such a simple relationship, one party per side, it is not easy to determine the true cost-spreading relationship. For the employees, rejection of the collective bargaining agreement will not mean a reduction of wages from current levels, but neither will it mean a reduction in Rath's current wages expense account. On the other hand, a change in the health insurance plan would garner significant savings for Rath while actually improving the overall plan for the employees. With regard to work rule changes, the evidence shows that Rath could eliminate significant inefficiencies by changing the seniority system. It is unclear what, if any, monetary loss would inure to the employees from changes in the seniority. No doubt restrictions on the seniority benefits currently in force would, at the least, be a loss of an intangible benefit, and thus deserving of consideration in the balancing process.

Finally, the court has considered good or bad faith of each party. For the reasons stated in more detail in Div. VII *infra,* the Court finds that all parties have exhibited good faith in the collective bargaining negotiations, and in the proceedings connected with the Application to Reject Executory Contracts.

After a careful balancing of all the factors previously discussed, and for the rea-

sons stated therein, this Court finds that the equities tip decidedly in favor of rejecting the collective bargaining agreement. Rath has, therefore, met both requirements of the *Kevin Steel—Bildisco—Brada Miller* complex of tests and would be allowed to reject the collective bargaining agreement if any of those tests were applied.

### 3. *Avoiding Liquidation*

Two cases purporting to follow *Kevin Steel, REA Express* and *In re Alan Wood Steel Co.,* 449 F.Supp. 165 (E.D.Pa.1978), have developed tests for rejection wherein likelihood of liquidation is the key factor. As a result, the *Bildisco* court referred to them as the "illegitimate progeny" of *Kevin Steel.* 682 F.2d at 81. Be that as it may, those cases also require an initial showing of burdensomeness before proceeding to a weighing of the equities. Both cases, however, hold that rejection should be allowed only if the Court finds that the debtor would be unable to reorganize unless the contract is rejected. The procedural approach of *REA Express* is, however, somewhat different from that of *Alan Wood Steel.* In *REA Express,* the court required a finding, after a careful weighing of all factors, that the collective bargaining agreement would thwart efforts to save the debtor from collapse. 523 F.2d at 169. In *Alan Wood Steel,* however, the court required a finding that the collective bargaining agreement is onerous and burdensome to the extent that failure to reject will make a successful reorganization impossible. Only if that threshold requirement is met would the Court proceed to balance the equities. 449 F.Supp. at 169.

It is not clear to this Court whether the tests in those two cases are more stringent than those requiring a careful balancing, but the reasoning supporting either approach is suspect. Nevertheless, Rath has made a sufficient showing, under either test, to allow rejection. The ultimate goal of *REA Express* is to prevent liquidation.

For the reasons previously stated, the facts indicate that Rath could not successfully reorganize with the collective bargaining agreement intact. Therefore, the *REA Express* test would allow rejection. The *Alan Wood Steel* test has also been met. Rath's collective bargaining agreement is onerous and burdensome, and liquidation will likely result if the agreement is not rejected. That meets the first step of the test. As for the second step, this Court has balanced the equities and found that they are in favor of rejection. Therefore, the *Alan Wood Steel* test would allow rejection.

### 4. *Other Tests*

Bordewieck & Countryman, *supra,* would require an employer/debtor-in-possession to bargain with the union for the necessary changes. Only if the union refuses to agree to the changes should the court entertain an application to reject the contract. This appears to be a reasonable standard, and is obviously directed towards good faith considerations. For reasons previously stated, this Court cannot endorse such a test, but it appears, nevertheless, that Rath has met the requirements of the test. While Rath did not engage in extensive negotiation with the union prior to filing its Application to Reject,[11] there were extensive negotiations between November 1, 1983 and December 20, 1983, when the hearing on this matter began. During these negotiations Rath has attempted to procure concessions that would make rejection of the collective bargaining agreement unnecessary. It would be misleading to say that the International has refused to grant the requested concessions. The evidence shows that the International did agree to many, if not most, of the concessions sought by Rath. The evidence also shows that the offered concessions were not unconditional, and the International sought a total agreement rather than unilateral concessions. The Court cannot say that the International's

---

11. There is however the testimony of Mr. Taylor that Rath sought, prior to filing the Chapter 11 Petition and the Application to Reject Executory Contracts, to negotiate its collective bargaining agreement with the Local or International. The Record does not disclose the extent of that effort or the reception it received.

position is unreasonable. Neither can the Court say that Rath was unreasonable in refusing to accept the total package offered by the International. As noted *supra,* the Court cannot and should not inject itself into the negotiation process. The fact remains, however, that the International has not agreed, in toto, to the concessions demanded by Rath. Therefore, even under this very stringent test, this Court may decide if rejection should be allowed. For all the reasons considered herein, the Court now finds that all parties are best served by allowing Rath to reject its collective bargaining agreement with the United Food & Commercial Workers Union.

There are perhaps other tests that could be articulated to govern rejection of collective bargaining agreements. This Court has attempted to set out in detail all the relevant facts in the record, and believes those facts support rejection under any formulation of criteria rationally designed to accommodate the policies of both the Bankruptcy Code and the National Labor Relations Act.

## VII. GOOD FAITH

Good faith is a relevant factor in several of the previously discussed tests, but it should be treated in greater detail because it is the central issue of the International's argument against rejection of the collective bargaining agreement.

The International contends that there has not been good-faith bargaining because Rath has made one proposal and has refused to make any significant concessions upon that proposal. The International asserts that it is *per se* bad faith to make one proposal and then remain steadfast. The legal authority for such a position appears somewhat tenuous. *See e.g., National Labor Relations Bd. v. American Nat. Ins. Co.,* 343 U.S. 395, 402–06, 72 S.Ct. 824, 828–31, 96 L.Ed. 1027 (1952). In addition, there is evidence in the record which suggests that Rath has made some offers to compromise its initial proposal.

The International also contends that Rath's Application currently before the Court is an attempt at "union busting."

Given the record before this Court, such an allegation simply does not ring true. First, an Order from this Court allowing Rath to reject its collective bargaining agreement in no way authorizes Rath to ignore its duty under the NLRA to enter into good-faith bargaining with the collective bargaining unit which represents the Rath employees. The Rath employees retain their right to strike, and Rath management must recognize that fact if it deals unfairly with the employees. In addition, Rath has met with the International on a number of occasions since the filing of its Chapter 11 Petition seeking to reach an agreement on the contract concessions Rath believes it needs. Also, there is a long history of cooperation between Rath and the United Food & Commercial Workers Union. There is no evidence in the record which suggests that Rath would prefer to operate its business in a union-free environment. In short, the record simply cannot support any allegation of "union busting."

The International presented evidence that Mr. Lyle Taylor repeatedly threatened to "Let the judge decide" if the union did not agree to the company's proposal. On cross-examination, the testimony revealed that the International representative had alluded to possible strikes or boycotts if Rath did not make concessions. Neither of these examples appears to be anything more than negotiation tactics. They certainly do not represent conduct which exhibits bad faith.

Additionally, the Court notes that the International has filed unfair labor practice charges against Rath because of the reduction in wages (to $7.24 per hour from $10.24 per hour) agreed to by the local union. Also, the testimony of Mr. Anderson revealed that the International will not allow the locals to vote on any company proposal containing a wage rate of less than $8.00 per hour. This Court assumes that these practices are legitimate options available to the International as part of the give and take of collective bargaining. These actions by the International do, however, show that

it is not impotent in this bargaining situation.

The International paints a picture of Rath stonewalling negotiations, and then using the court as a club to beat the union into submission. The Court is unpersuaded. It appears rather that both sides have fired their big negotiating guns to no avail in terms of a settlement. Because the parties have been unable to negotiate a settlement, the issue of contract rejection has become ripe for decision.

## VIII. CONCLUSIONS

■ Faced with the Application *sub judice,* this Court has two choices: grant the Application or deny the Application. This Court does not, however, have the choice to reopen the Los Angeles plant, for example, or close the San Antonio plant. Nor does this Court have the choice to demand a concession from the employees or from the company. Specifically, this Court does not have the choice to decrease or increase incentive pay, to pay or not to pay for three days of sick leave, to terminate or reinstate the pension plan, or to eschew or recoup capital investment and cost of living adjustments. Likewise, this Court does not have the choice to decrease the number of "bumps" from 458 per week to a manageable number. Nor does this Court have the choice to mandate a $7.24, or a $8.00, or a $10.24 hourly wage. Similarly, this Court does not have the choice of reducing or increasing benefits such as night premiums, prescription drugs, clothes changing time, and vision care. The choice of an A–B–C seniority system vis-a-vis an X–Y–Z system (for example) does not belong to this Court. All these choices and options may, however, be exercised only by the parties. Through negotiations, the parties should have exercised their choices and options. They did not. Between the choice of denying the Application (which binds the debtor-in-possession to all the provisions in the collective bargaining agreement) and of granting the Application (which would relieve the debtor-in-possession of all provisions), this Court must pick one. Neither option is palatable. Nonetheless, it would be an abandonment of the Court's duty to not make the choice. Given the uncertainty of the applicable legal standard, the projected death of a ninety-year-old company within ninety days, the economic health of numerous employees and the community, this Court concludes that, except for the notice problems with the Indianapolis union, *see* Div. II *supra,* the Application should be granted. By so concluding, this Court recognizes that there is no assurance that Rath will successfully rehabilitate. Similarly, there is no assurance that the employees—whose concessions totaled millions of dollars—will be well-served and their jobs preserved. There is likewise no assurance that the labor problems will subside. Indeed, the National Labor Relations Board, not the Bankruptcy Court, is perhaps better equipped to resolve labor disputes. Nonetheless, this Court concludes that Rath's bid for reorganization will fail if it is not permitted to reject the collective bargaining agreement, and the equities of the case support rejection.

## ORDERS

IT IS THEREFORE ORDERED that the Court's Order of December 30, 1983, be enlarged as follows:

1. The Debtor-in-Possession shall forthwith serve its Application to Reject Executory Contract on the Indianapolis union. Within ten (10) days of receipt of the Application by the Indianapolis union of the Application, the union shall file an appropriate response. If no response is filed within said ten-day period, the Debtor-in-Possession may file an application for entry of an appropriate Order by this Court.

2. The objection asserted by the Debtor-in-Possession to the admission of Defendant Exhibit S is sustained and Defendant Exhibit S is not admitted into evidence.

3. The objection asserted by the United Food & Commercial Workers International Union to the admission of Plaintiff Exhibit 19 is overruled and Plaintiff Exhibit 19 is admitted into evidence.

4. The objection asserted by the United Food & Commercial Workers International

998

Union to the admission of Plaintiff Exhibit 4 is sustained and Plaintiff Exhibit 4 is not admitted into evidence at this time.